**CHRYSLER CREDIT CORPORATION,**
**Plaintiff–Appellant, Cross–Appellee,**

v.

**H & H**
**CHRYSLER–PLYMOUTH–DODGE,**
**INC.; et al., Defendants,**

**Rondal W. Harmon; Claude Harmon; Zella Harmon; Robert Harmon; and Nancy Harmon, Defendants–Appellees, Cross–Appellants.**

Nos. 88–6431, 89–5024.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 9, 1990.

Decided March 6, 1991.

Thomas C. Hundley, Stites & Harbison, Louisville, Ky., Buckner Hinkle, Jr., Grego-

ry P. Parsons (argued), Cheryl Lewis, Stites & Harbison, Lexington, Ky., for plaintiff-appellant, cross-appellee.

J. Calvin Aker, Beattyville, Ky., Howard O. Mann (argued), Corbin, Ky., for defendants and defendants-appellees, cross-appellants.

Before JONES and BOGGS, Circuit Judges; and WELLFORD,* Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

This dispute against Chrysler Credit Corporation (CCC) arises out of the closing of an authorized Chrysler automobile dealership located in Corbin, Kentucky. CCC initiated this lawsuit for the collection of debt from defendant, H & H Chrysler–Plymouth–Dodge, Inc. ("H & H"), and Rondal Harmon, H & H's principal owner and guarantor under its agreement with CCC, which provided for both retail and wholesale financing. CCC was the primary creditor of defendants at the time H & H closed. CCC had security interests in the automobile inventory and other assets of H & H, and after the closing, CCC initiated a state court action for recovery of its collateral. H & H subsequently surrendered those assets to CCC for liquidation.

Prior to the liquidation of the automobile inventory, H & H owed CCC $546,000, the amount of financing provided by CCC to enable H & H to purchase vehicles from Chrysler Corporation. CCC liquidated the H & H inventory for $530,000, leaving a deficiency of approximately $16,000. In addition to this deficiency from the sale of inventory, CCC's complaint includes a claim for $42,702.81, a figure representing the amount owed by H & H to CCC for five new automobiles allegedly sold outside the terms of the security agreement.

The district court determined that after the liquidation of its assets, the balance owed by H & H to CCC, including attorneys' fees and other miscellaneous costs, totalled $105,391.28. He found further, however, that CCC was not entitled to judgment against H & H for any portion of

this indebtedness because CCC did not dispose of the repossessed collateral in a commercially reasonable manner, because CCC did not give reasonable notice to H & H or Rondal Harmon of the sale of the collateral. CCC contends not only that the disposition of collateral was commercially reasonable, but also that the debtor waived notice of the sale and should be estopped from asserting lack of notice. Finally, CCC asserts that even if the sale of the collateral was found not to be commercially reasonable, it is entitled to judgment with regard to that portion of its claim not attributable to the deficiency by reason of the liquidation of the collateral with respect to the five automobiles sold outside the trust terms.

Most of the trial concerned the issue of whether the transfer of real estate from Rondal Harmon to his relatives was a fraudulent conveyance. This determination was critical to CCC's efforts to collect the H & H debt because of the insolvency of both H & H and Rondal Harmon at the time the lawsuit was instituted. At the time the lawsuit was filed, H & H was insolvent but all of its debts to CCC were individually guaranteed by the sole shareholder and president, Rondal Harmon, who transferred to his relatives the real estate which he owned and leased to the H & H dealership. The district court concluded that the transfer by Rondal Harmon to his relatives was a fraudulent conveyance. Rondal Harmon, Claude Harmon, Zella Harmon, Robert Harmon, and Nancy Harmon now cross-appeal from the district court's ruling that the transfer of the real estate by Rondal Harmon was a fraudulent conveyance.

H & H entered into a series of written agreements with CCC including a vehicle financing and repurchase security agreement, and other credit agreements required by CCC in order to provide wholesale and retail financing for H & H's acquisition of automobiles.

Rondal Harmon became the sole shareholder, and together with cross-appellant

* The Honorable Harry W. Wellford assumed senior status January 21, 1991.

family members, as accommodation parties, began borrowing funds for dealership operations from a local bank for operating expenses and construction of a permanent dealership building on the real estate which H & H had leased. In August 1985, Rondal Harmon subsequently transferred the real estate upon which the H & H dealership was located to his parents, Claude and Zella Harmon, his brother, Robert Harmon, and his sister-in-law, Nancy Harmon.

CCC was the primary creditor of H & H from its inception, and provided the financing essential to H & H's operation as a Chrysler dealer including the typical wholesale "floor plan" financing. After only a short period of operations, CCC became concerned with the financial stability of H & H. Its branch manager performed an audit of the H & H inventory and discovered that H & H had not been repaying its wholesale loans to CCC in a timely manner as the covered vehicles were sold. He also performed a bank cutoff analysis and determined that the financial statement which had been submitted by H & H to CCC a short time previous was erroneous. (In fact, the corporation had a deficit bank balance of $25,000 instead of a positive balance as represented). As a consequence, CCC concluded that it would not extend further credit to H & H.

A few months later, Rondal Harmon met with representatives of CCC for the purpose of reestablishing the H & H credit lines. At that time, Harmon presented his personal financial statement listing his most significant asset to be the real estate, valued at $225,000, on which the H & H dealership was located. Harmon had in fact transferred the real estate to his relatives at this juncture and he falsely represented to CCC that he still owned that property.[1]

In reliance upon Harmon's representations regarding his personal financial status, CCC reopened H & H's credit lines in November 1985. Approximately one month later, December 15, 1985, H & H went out of business. CCC then promptly requested H & H to surrender all inventory, equipment, fixtures, and assets in which CCC had a security interest. Initially, H & H refused, but after CCC filed a state court action in the Knox Circuit Court, Harmon agreed to execute a voluntary surrender of the H & H assets to CCC. The voluntary surrender released all the dealership's inventory, equipment, fixtures, and other assets to CCC for "the purpose of lease, sale, or other disposition to be accomplished in a commercially reasonable manner and in accordance with K.R.S. § 355.9–504."[2] The voluntary surrender was prepared by Rondal Harmon's attorney, Jane Butcher, and was signed by Rondal Harmon on January 26, 1986, at Butcher's office in the presence of Jim Taylor.

Following the execution of the voluntary surrender, Taylor, Harmon and Butcher went to the dealership where representatives of CCC were negotiating with Don Pickard, the successor dealer, for the sale of the H & H assets. Harmon refused to participate in the negotiations, but Butcher informed representatives of CCC that H & H would attempt to obtain bids on the assets. Pickard ultimately purchased a substantial portion of H & H's fixed assets and inventory on January 30, 1986, the balance being sold to other Chrysler dealers on later dates.

CCC asserts that the district court erred in finding that CCC did not act in a commercially reasonable manner in liquidating H & H's assets, since the collateral was of a type customarily sold on a recognized market obviating the need for notice. In

---

1. We find no error in the district court's opinion that the conveyance of the dealership from Rondal Harmon to his parents, his brother, and his sister-in-law was a fraudulent conveyance under Kentucky law. *See Russell County Feed Mill, Inc. v. Kimbler,* 520 S.W.2d 309 (Ky.1975); *Bank of Josephine v. Hopson,* 516 S.W.2d 339 (Ky. 1974).

2. The voluntary surrender also stated:

Borrower acknowledges that it does not own, hold or claim sufficient assets to pay in full all the indebtedness owing Chrysler Credit Corporation and realizes that there will be a deficiency, the exact amount of which is not now ascertainable.

any event, CCC contends that the notice given was reasonable.

■ Under Kentucky law, a secured party may recover a deficiency judgment from a defaulting debtor if it proves that it acted with commercial reasonableness in the holding and the disposition of the collateral in question. *Bailey v. Navistar Fin. Corp.*, 709 S.W.2d 841, 842 (Ky.App.1986). A secured party that fails to establish the commercial reasonableness of its actions may be estopped from obtaining a deficiency judgment against the debtor. *Id.; Bank Josephine v. Conn*, 599 S.W.2d 773, 775 (Ky.App.1980); *see also* Ky.Rev.Stat. Ann. § 355.9–504. The question of whether CCC complied with all the provisions of K.R.S. § 355.9–504 and whether the disposition of the collateral or the form of the notice was "commercially reasonable" is a mixed question of law and fact. *McCoy v. American Fidelity Bank & Trust Co.*, 715 S.W.2d 228, 230–31 (Ky.1986); *Bailey*, 709 S.W.2d at 842, quoting *Bank Josephine*, 599 S.W.2d at 774.

Kentucky Revised Statutes § 355.9–504(3) provides in pertinent part:

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor if, except in the case of consumer goods, he has not signed after default a statement renouncing or modifying his right to notification of sale.

*Nelson v. Monarch Invest. Plan*, 452 S.W.2d 375, 376–77 (Ky.1970), held that used cars are not goods of the type customarily sold on a recognized market:

A "recognized market" might well be a stock market or a commodity market, where sales involve many items so similar that individual differences are nonexistent or immaterial, where haggling and competitive bidding are not primary factors in each sale, and where the prices paid in actual sales of comparable property are currently available by quotation. *Id.* at 376–77, quoting *Norton v. National Bank of Commerce of Pine Bluff*, 240 Ark. 143, 398 S.W.2d 538, 540 (1966). The district court, citing *Nelson*, applied this rationale to new cars as well as the other equipment and parts owned by H & H. Other courts that have considered the issue have concluded that the "recognized market" exception is restrictive and narrow. *See 1st Charter Lease Co. v. McAl, Inc.*, 679 P.2d 114 (Colo.App.1984) (computers); *State Bank of Towner v. Hansen*, 302 N.W.2d 760 (N.D.1981) (livestock and farm machinery); *Maryland Nat'l Bank v. Wathen*, 288 Md. 119, 414 A.2d 1261 (1980) (automobiles); *O'Neil v. Mack Trucks, Inc.*, 533 S.W.2d 832 (Tex.Civ.App.1975), *rev'd on other grounds*, 542 S.W.2d 112 (Tex.1976) (new trucks); *see also* White & Summers, *Uniform Commercial Code*, § 27–12 (1988) ("Any transaction which involves competitive bidding or haggling over price should not be considered as one conducted on a recognized market because negotiations between buyer and seller rather than neutral market forces determine the price.")

■ We conclude that the assets of H & H were not of a type customarily sold on a recognized market. Various Chrysler dealers including Don Pickard, the successor dealer, negotiated with CCC for the purchase of the cars, parts and dealership equipment. An auction company and Don Pickard submitted competitive bids for the dealership contents. Because no "recognized market" existed for the collateral liquidated, CCC was under an obligation to provide H & H or Rondal Harmon with reasonable notice of the sale of the collateral.

Kentucky Revised Statutes § 355.9–504(3) requires that "reasonable notification of the time after which any private sale ... is to be made" be given to a debtor to allow it sufficient time to protect its interest in the collateral. *Bailey*, 709 S.W.2d at 843 ("The purpose of pre-sale notice is to give the debtor sufficient time to protect his interest in the collateral by

participating in the sale, or by taking appropriate steps to oppose the sale."); *Nelson,* 452 S.W.2d at 377.

> We construe this provision to mean that the debtor is entitled to notification of a specific date after which the creditor may proceed to dispose of the collateral. This would give the debtor a deadline within which to protect himself in whatever manner he saw fit. Knowledge would be brought home to him that if he failed to liquidate his indebtedness, or reach an agreement with respect to the collateral, or failed to take other appropriate action by a specified time, he would be foreclosed from attacking the subsequent sale.

*Nelson,* 452 S.W.2d at 377.

■ The district judge, an experienced Kentucky jurist, found that CCC did not give reasonable notification to H & H or Harmon. CCC argues that because Harmon was present at the dealership on January 30, 1986, and knew of the negotiations between CCC and Don Pickard, he had reasonable notice of the sale of the collateral. Harmon's mere presence and knowledge that the collateral would eventually be sold does not appear to satisfy the requirements of K.R.S. § 355.9-504(3) that CCC notify H & H or Harmon of a *time* after which the collateral could be sold. Despite his voluntary surrender of the collateral, Harmon did not give up his right to receive "reasonable notification" of its sale. Although it is a close question, we hold that the district court did not commit error in concluding that CCC failed to conduct the sale of the assets of H & H in a commercially reasonable manner.

■ CCC next claims that Harmon waived notice or is estopped from challenging lack of notice. The district court found that there was no waiver and that in fact H & H indicated that it would attempt to solicit bids for the collateral.

Waiver of notice is an issue of fact within the purview of the factfinder. *Herring Mining Co. v. Roberts Bros. Coal Co.,* 747 S.W.2d 616, 619 (Ky.App.1988). Findings of fact by a district court should not be reversed unless found to be clearly errone-

ous. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (finding of fact is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed").

The record in this case does not indicate that defendants intended to waive notice or should be estopped from claiming lack of notice. *See Nelson,* 452 S.W.2d at 378. The voluntary surrender executed by Rondal Harmon states that the sale or disposition of the collateral was "to be accomplished in a commercially reasonable manner and in accordance with K.R.S. § 355.9-504." Because CCC failed to give proper notice under K.R.S. § 355.9-504, Harmon's refusal to participate in negotiations with Don Pickard for the sale of the collateral should not be interpreted as a waiver by Harmon of his right to notice under the circumstances.

■ Finally, CCC asserts that the district court erred in denying recovery of its entire claim against Rondal Harmon. Specifically, CCC argues that even if the sale of the collateral was not commercially reasonable, it may still recover the portion of its claim that it asserts is not directly attributable to the sale of the collateral. We agree that plaintiff may be able to prevail on this argument.

CCC contends that five automobiles were sold out of the trust and that these five new automobiles, or the proceeds thereof, constituted a "missing collateral," or "sold out of trust situation." CCC claims it is entitled to credit and a deficiency in this approximate amount even if there were no commercially reasonable sale of the collateral inventory. The district court did not address the contention, which we believe may have merit. We, therefore, REMAND the case for a determination by the district court of this issue. We are persuaded that the interests of justice mandate a consideration of this issue.

In summary, we AFFIRM the district court in all respects but we REMAND to the district court for its determination of

CCC's claim that it is entitled to a deficiency judgment for the five vehicles allegedly sold out of trust.