RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

WENDELL SHANE MACKEY,

          *Plaintiff-Appellant*,

    *v.*

JEFF RISING,

          *Defendant-Appellee*,

CITY OF ADRIAN, MICHIGAN; AMERITRUST GROUP, INC.,

          *Respondents*.

⎤
⎟
⎟
⎟
⎟
⎟
⎬   No. 22-2165
⎟
⎟
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-13408—Nancy G. Edmunds, District Judge.

Argued:  October 26, 2023

Decided and Filed:  July 1, 2024

Before:  MOORE, READLER, and MURPHY, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:**  Issa Ghaleb Haddad, HADDAD LAW FIRM, PLC, Bingham Farms, Michigan, for Appellant.  Christian C. Huffman, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellee and Respondents.  **ON BRIEF:**  Issa Ghaleb Haddad, HADDAD LAW FIRM, PLC, Bingham Farms, Michigan, for Appellant.  Christian C. Huffman, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellee and Respondents.

—————————————

**OPINION**

—————————————

MURPHY, Circuit Judge.  State employees do not work for the State every hour of the day.  They also undertake all sorts of private activities on their own time.  Yet the Fourteenth Amendment restricts only the actions of a "State," and 42 U.S.C. § 1983 grants a remedy only against those who act "under color of" a state law, custom, or the like.  So what distinguishes an employee's state actions that trigger these provisions from the employee's private actions that do not?  The Supreme Court recently addressed this topic in a decision about an employee's use of social media: *Lindke v. Freed*, 601 U.S. 187 (2024).

This case allows us to apply *Lindke*'s guidance.  Jeff Rising, a real-estate agent, served one term as a part-time City Commissioner for Adrian, Michigan.  Shane Mackey, a local resident, posted information about Rising on Facebook that Rising believed to be false.  Rising responded by calling Mackey's mother.  During this call, Mackey alleges, Rising threatened to "hurt" him if he did not delete the post (an allegation that Rising denies).  Mackey sued.  He argued that Rising's threat of physical violence violated the First Amendment because Rising made it in his capacity as a Commissioner to stifle Mackey's speech.  Early on in the suit, Rising accepted the City's insurance to pay for his defense.  But he then testified that he had called Mackey's mother as a private citizen.  According to Mackey, Rising's use of the City's insurance showed that Rising had waived (or should be judicially estopped from raising) his lack-of-state-action defense.

Mackey is wrong on both fronts.  Rising served as a legislator, not a police officer.  The City of Adrian thus did not grant him any "authority" to use (or threaten) physical force on its behalf.  *Id.* at 198.  And because the City "did not entrust" Rising with this power, his alleged "misuse" of the power cannot qualify as state action.  *Id.* at 199–200.  Next, Rising accepted the City's insurance for his defense because he maintained that the insurer's duty to defend turned on Mackey's allegations alone (which claimed that Rising had acted for the City).  Because his state-action defense on the merits did not conflict with his view of the insurer's duty to defend,

neither waiver nor judicial estoppel apply. We thus affirm the grant of summary judgment to Rising.

I

The small City of Adrian sits about sixty miles to the southwest of Detroit. The City's government includes an elected City Commission (its legislative body) made up of six Commissioners and a Mayor. This Commission bears the responsibility to, among other things, enact the City's ordinances and approve the City's budget.

In 2013, Jeff Rising decided to run for a seat on the Commission at the suggestion of a retiring Commissioner. Rising had lived in Adrian for decades but never served in government. He had instead built a successful real-estate business under the RE/MAX name. In November, Adrian voters elected Rising to a four-year term as a Commissioner. In the same election, Jim Berryman won the mayoral race. The two developed a good working relationship.

Over the next four years, Rising regularly attended the Commission's meetings twice a month to conduct the City's legislative business. The City did not provide him with an office, car, computer, or phone. He thus used his private property to perform his public duties. But the City did give him an official Facebook account and email address. It also paid him a small stipend ($700 after taxes) every three months.

When the next election approached in November 2017, Berryman and Rising both had to consider whether to seek another term. Berryman chose to run for reelection as Adrian's Mayor. But Rising decided to leave public service.

Shane Mackey decided to run for a Commissioner seat during this 2017 election. Leading up to the election, he became a regular at the Commission's meetings. He had long harbored animosity toward Berryman. Thirty years earlier, the State had convicted Mackey of breaking into Berryman's flower shop. *Berryman v. Mackey*, 935 N.W.2d 94, 97 (Mich. Ct. App. 2019). At a meeting, Mackey accused Berryman of engineering his lengthy sentence for this crime. *See id.* He also called Berryman "crooked" for decisions he made as Mayor. *Id.* at 97–98.

Apart from speaking at meetings, Mackey used the internet to criticize the Mayor and Commissioners. He created an anonymous blog (www.exposingadrian.com) dedicated to disclosing the Commission's purported misdeeds. His posts alleged, among other things, that the Commission had violated Michigan's open-meetings law, misused funds, and awarded lucrative contracts to "cronies." He separately created an anonymous Facebook page ("Anyone But Berryman") that disparaged the Mayor and Commissioners. For example, the page's profile picture superimposed Berryman's face on a picture of Adolf Hitler in a Nazi uniform.

While Rising had decided not to seek reelection, he did not escape Mackey's ire. In a June 2017 post, Mackey criticized all the Commissioners (including Rising) for living in the same upscale part of Adrian. The post contained a map with a picture of each Commissioner over that Commissioner's home. Worried that Mackey had disclosed his address online, Rising asked the police for extra patrols around his street.

Mackey "strategically waited" until weeks before the election to reveal more salacious information about Rising. Mackey Aff., R.48, PageID 1286. In 2000, Rising had worked as an emcee and backup dancer for a traveling show affiliated with Chippendales (the company known for its risqué male dancers). Around 10:30 p.m. on October 14, Mackey posted on his "Anyone But Berryman" Facebook page a picture of Rising and five men in their signature Chippendales uniform (shirtless with a bow tie around their necks and shirt cuffs around their wrists). Mackey's caption to this picture accused Rising of using cocaine and affiliating with a criminal: "Here's our morally corrupt, former cocaine using City Commissioner Jeffrey Rising sitting next to his convicted felon buddy John Stepansky, who robbed the China Buffet. And these nasty people claim to take the moral high road. #CorruptPolitician #Shameful." Facebook Page, R.48, PageID 1401.

Rising had spent the evening relaxing at home while consuming "[t]hree or four" cans of Miller Lite. Rising Dep., R.48, PageID 1366–67, 1377. He saw the Anyone But Berryman post because the anonymous author tagged him. Rising assumed that Mackey ran this Facebook page. He also knew Mackey's mother—Alice Mackey—because she was a fellow real-estate agent in Adrian. Rising thus responded to the post using his personal Facebook account: "Nice

try Shane Mackey. My past isn't a secret. Alice Mackey get your kid in line." Facebook Page, R.48, PageID 1402.

On seeing this comment, Mackey responded (under the Anyone But Berryman moniker): "So your cocaine use isn't a secret? Then surely you'll have no problem discussing it during the next City Commission meeting, right? In light of Mackey's litigation record and Berryman's inability to get even a PPO to stick against him, you might want to think before defaming people. #NoMoreCocaineComissioners." *Id.* Mackey posted several more comments ridiculing Rising and Berryman over the next hour.

As the night wore on, Rising grew increasingly alarmed by Mackey's post. He had never used cocaine. And he had not seen John Stepansky (the alleged criminal in the picture) for years. Rising worried that the post's claims could harm his "reputation as a business owner in the community." Rising Dep., R.48, PageID 1378. He wanted Mackey to delete the post "before thousands of people saw it." *Id.* Rising did not have Mackey's phone number, but he did have the contact information of Adrian's real-estate agents, including Mackey's mother. Rising decided to call her around 12:30 a.m. Despite the late hour, she answered.

The parties dispute what Rising said to Mackey's mother. According to Mackey, Rising made threats. Mackey's mother recalled Rising stating: "You better tell that motherfucking piece of shit son of yours that [he] better quit posting/putting on Facebook shit about me." Mackey Aff., R.48, PageID 1288. She responded by asking if Mackey had posted something about Rising. Rising retorted: "He's doing it right now and I'm telling you [he] better stop it or somebody is going to get hurt." *Id.* (emphasis omitted). According to Rising, he did not use profanity or threaten anyone. He merely asked Ms. Mackey to convince her son to remove what he thought were "inflammatory" and "untrue" statements about him. Rising Dep., R.48, PageID 1364, 1377. At this stage of the case, we must accept Mackey's version of this conversation. *See Gambrel v. Knox County*, 25 F.4th 391, 401 (6th Cir. 2022).

A few days later, Mackey's mother reported Rising's late-night call to the police. The police opened an investigation. Ultimately, an investigator found that there was "no way to prove what words Mr. Rising used when he made the phone call[.]" Report, R.48, PageID 1410.

In the ensuing months, Mackey and Rising encountered each other a few more times. Rising skipped the next Commission meeting, but he attended the following one (his last as a Commissioner). He asked the police to escort him to his car at the meeting's end because Mackey looked agitated in the audience. A month after the election (which Berryman and Mackey both lost), Mackey also allegedly threatened Rising when they ran into each other at a restaurant. They have not spoken since.

Roughly two years after these events, Mackey brought this suit under 42 U.S.C. § 1983 over Rising's late-night phone call to his mother. As relevant to this appeal, Mackey asserted that Rising's threats on the call violated the First Amendment because he made them as a city official in retaliation for Mackey's political criticism.

Rising (now just a private citizen) alerted Adrian of Mackey's suit because the events had occurred during his time as a City Commissioner. The City forwarded the complaint to its unique insurer: the "Michigan Municipal League Liability and Property Pool" (what we will call the "Liability Pool" for short). Michigan law allows municipalities to form and pay for a "group self-insurance pool" that will provide insurance to them and their employees "for acts or omissions arising out of the scope of their employment[.]" Mich. Comp. Laws § 124.5(1). Municipalities formed the Liability Pool under this law. Adrian later joined it.

The Liability Pool sent Rising a letter noting that it had appointed lawyers to defend him. It reasoned that its duty to defend Rising depended on the "allegations" in Mackey's complaint even if Rising would dispute those allegations in the suit. Letter, R.25-3, PageID 693. And the complaint's allegations suggested that Rising had threatened Mackey in his capacity as a City Commissioner.

During his deposition, however, Rising opined that he had not called Mackey's mother in his official capacity. This testimony led Mackey to move the district court to enjoin Rising from using the Liability Pool's "public funds" for his defense. Mot., R.23, PageID 574. Because Michigan law barred the City from reimbursing Rising for private conduct, Mackey reasoned, Rising had a choice between two options: admit that he acted in his official capacity or decline the Liability Pool's funds. A magistrate judge denied Mackey's motion.

The district court later granted summary judgment to Rising. It concluded that he had acted as a private citizen when he made the alleged threats. *Mackey v. Rising*, 2022 WL 17325916, at *4 (E.D. Mich. Nov. 29, 2022). It also rejected Mackey's argument that Rising could not raise his state-action defense because he chose to accept the Liability Pool's funds. *See id.* at *3. We review this decision de novo. *See Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001).

II

Mackey raises two general arguments on appeal. He first claims that a dispute of fact exists over whether Rising acted in his capacity as a City Commissioner when he called Mackey's mother. He next claims that Rising cannot raise his state-action defense because of Rising's choice to accept legal representation from the Liability Pool. Both arguments lack merit.

### A. Did Rising call Mackey's mother as a "state actor"?

Mackey asserts a § 1983 claim against Rising for violating his "freedom of speech" under the First Amendment. The constitutional and statutory parts of Mackey's claim both contain a "state action" element. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928–29 (1982). As a constitutional matter, the Fourteenth Amendment expanded the First Amendment to cover the speech-suppressing actions of a "State." U.S. Const. amend. XIV, § 1. Yet the First Amendment still does not reach a *private* party's efforts to stifle speech. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). As a statutory matter, § 1983 allows plaintiffs to sue a defendant who "subjects" them "to the deprivation" of their "rights" if the defendant acts "under color of any statute, ordinance, regulation, custom, or usage, of any State[.]" 42 U.S.C. § 1983. Yet this text likewise does not reach a *private* defendant's actions. *See Lindke*, 601 U.S. at 194.

### 1. What distinguishes "state" action from "private" action?

The Supreme Court has long interpreted these constitutional and statutory state-action requirements in an "identical" way. *Id.* at 195 (quoting *Lugar*, 457 U.S. at 929). Because States

today often hire full-time public staff to carry out their functions, "state action is easy to spot" most of the time. *See id.*; *West v. Atkins*, 487 U.S. 42, 49–50 (1988). That said, courts often confront two different (yet equally "difficult") state-action problems. *Lindke*, 601 U.S. at 195–96.

The first arises from the States' traditional practice of hiring ostensibly private parties (such as doctors) to perform public services (such as the provision of medical care to prisoners). *See West*, 487 U.S. at 43–44; *see also Filarsky v. Delia*, 566 U.S. 377, 385 (2012). When do these private parties qualify as state actors under the Constitution and § 1983? The Supreme Court has adopted various tests (a public-function test, a state-compulsion test, and a nexus text) to answer this question. *See Lugar*, 457 U.S. at 939. We need not consider any of these tests here.

This case instead concerns the second state-action problem. *See Lindke*, 601 U.S. at 196. All agree that Adrian City Commissioners like Rising qualify as "state actors." *Cf. Lozman v. City of Riviera Beach*, 585 U.S. 87, 91–92 (2018); *Bogan v. Scott-Harris*, 523 U.S. 44, 46–48 (1998). But state officials have private lives. So how should we distinguish their official conduct (which falls within the Fourteenth Amendment and § 1983) from their "personal" conduct (which falls outside those provisions)? *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion).

The Supreme Court in *Lindke* recently addressed this question in the social-media context. 601 U.S. at 190–91. There, a city manager wrote posts about both family matters and job-related matters on his personal Facebook page. *Id.* at 191–93. In comments to some of these posts, a city resident criticized the city's response to the COVID pandemic. *Id.* at 193. The manager deleted these comments and later blocked the resident from commenting on his Facebook page. *Id.* The resident sued, alleging that this conduct violated the First Amendment. *Id.* The Court thus had to consider whether the city manager had operated his Facebook page as a private citizen or city official. *Id.* Ultimately, it adopted a two-part test to determine whether the manager had spoken for the city in his social-media posts. *Id.* at 191. First, the manager must have "possessed actual authority to speak on the State's behalf" in the social-media posts.

*Id.* Second, the manager must have "purported to exercise that authority when he spoke on social media." *Id.*

Outside the social-media context, our court—and the Supreme Court—have long followed a similar two-part test. When asking whether a challenged action qualified as state action, we described the "the controlling issue" as whether an official "possessed state authority" to take the action "and whether [the official] purported to act under that authority" on the specific occasion. *Dean v. Byerley*, 354 F.3d 540, 553 (6th Cir. 2004); *see Griffin v. Maryland*, 378 U.S. 130, 135 (1964). The Supreme Court in *Lindke* seemingly tailored this general test to the specific social-media context. *See, e.g.*, 601 U.S. at 191, 194, 197, 201, 203, 204. It also cautioned that courts should apply a "fact-intensive inquiry" when answering state-action questions and recognized the "rapidly changing" nature of social media. *Id.* at 197. Given this caution, we need not decide on the precise formulation that governs here. Under either formulation, Rising did not possess state authority to threaten violence against Mackey or his mother.

We reach that conclusion without proceeding past the first element: Did a state statute, ordinance, regulation, custom, or usage give the defendant the "actual" or "state" "authority" to engage in the relevant conduct? *Id.* at 191; *Dean*, 354 F.3d at 553. This element requires courts to identify the "nature of the act" that the plaintiff challenges, *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (citation omitted), and to compare that act with the state-assigned "responsibilities" of the official who committed it, *Lindke*, 601 U.S. at 199. The state official possesses the authority to take a challenged action only if the action meaningfully relates to the official's "governmental status" or the "performance of his duties." *Waters*, 242 F.3d at 359.

This test produces some easy answers. Most obviously, a state employee's conduct will meet the test if a state regulation tasked the employee with engaging in the specific conduct at issue. Consider our oft-cited decision in *Stengel*. There, a police officer shot three bar patrons while attempting to end a middle-of-the-night bar fight. 522 F.2d at 440. Although the officer was off-duty and out of uniform, "police department regulations" vested him with the authority—indeed, the duty—to stop crime "24 hours a day." *Id.* at 441. And state officials later approved the officer's force as consistent with these regulations. *Id.*

But things are not always so simple. In some situations, an official might possess the required state authority even if the State did *not* permit the conduct. In other situations, an official might not possess this state authority even if the State *did* permit it.

Begin with the first set of situations: A state official's conduct can qualify as state action even if the "particular action which he took" (say, a police officer's use of excessive force) "was not authorized by state law" (say, because it violated a State's use-of-force regulations). *Griffin*, 378 U.S. at 135; *see Screws*, 325 U.S. at 111 (plurality opinion). Ever since *Monroe v. Pape*, 365 U.S. 167 (1961), the Supreme Court has held that § 1983 covers state actors when they exercise authority delegated by the State—"whether they act in accordance with their authority or misuse it." *Id.* at 172. Or, as *Lindke* put it, state officials can satisfy the Court's "actual authority" test even if they go beyond (or "[*m*]*isuse*") the power that the State has entrusted them. 601 U.S. at 199 (quoting *Classic*, 313 U.S. at 326). Even before *Lindke*, our cases made the same point when they noted that officers can engage in state action if their conduct arose from an "*apparent* duty" of their office or "*ostensible* state authority[.]" *Waters*, 242 F.3d at 359 (emphases added). We interpret these statements—consistent with *Lindke*—to cover fact patterns when an official exercises state authority but exceeds the scope of the delegation. 601 U.S. at 200.

So what distinguishes the *misuse* of authority from the *absence* of authority? The Supreme Court has offered little guidance on this subject. But it has clarified that we must look beyond whether the State has permitted the "*particular* action" that a plaintiff challenges. *Id.* (quoting *Griffin*, 378 U.S. at 135) (emphasis added). We must instead ask whether the State has delegated the *general* "type of authority" that an official exercised. *Id.* Our cases about police officers prove this point. We often hold that the police engaged in state action when they purported to exercise law-enforcement powers—without stopping to ask whether their actions violated state regulations on, say, using force. *See Kalvitz v. City of Cleveland*, 763 F. App'x 490, 495–96 (6th Cir. 2019); *Barkovic v. Hogan*, 505 F. App'x 496, 500 (6th Cir. 2012); *McGuire v. City of Royal Oak*, 295 F. App'x 736, 738–39 (6th Cir. 2008); *Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005); *Memphis, Tenn. Area Loc., Am. Postal Workers*

*Union v. City of Memphis*, 361 F.3d 898, 903–04 (6th Cir. 2004); *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980).

Turn to the second set of situations: A state official's conduct might qualify as *private* action even if the State gave the official the authority to engage in the conduct in an abstract sense. States authorize (that is, permit) public and private parties alike to do many things. They, for example, permit their residents to file defamation suits against those that make false statements about them. Yet this state "authorization" does not transform all private citizens into state actors whenever they pursue defamation claims. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53–54 (1999); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164–65 (1978). And that rule applies even if the plaintiffs are state officials who threaten *private* defamation suits "to safeguard their personal reputations." *Meadows v. Enyeart*, 627 F. App'x 496, 501 (6th Cir. 2015); *see How v. City of Baxter Springs*, 217 F. App'x 787, 791–96 (10th Cir. 2007); *Gritchen v. Collier*, 254 F.3d 807, 812–14 (9th Cir. 2001). To create state action, then, a State must do more than permit all parties (public and private alike) to engage in the conduct at issue. The State must instead entrust a party with "state authority." *Dean*, 354 F.3d at 553.

This distinction matters. Even if a State permits a state official (like a "private citizen") to engage in certain conduct, the conduct will not qualify as state action if it falls outside the duties that the State has tasked the official to perform and if instead the State has permitted anyone to engage in the activity. *Redding v. St. Eward*, 241 F.3d 530, 533 (6th Cir. 2001). So a state-agency official did not engage in state action when he participated in political activities. *See Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 390–91, 396–97 (6th Cir. 2016). The political activities (such as public-records requests) had nothing to do with his duties for the agency, and any private person could have engaged in them. *Id.* at 396–97. Similarly, a city alderman did not engage in state action while committing domestic abuse even though he sometimes asked the police to search for his victim. *See Waters*, 242 F.3d at 355–57, 359–60. None of his conduct, including his requests to the police, arose from his "responsibility as an alderman." *Id.* at 360. Rather, the police helped him find the victim (his purported "friend") in the same way they would help any "citizen" search for missing "relatives[.]" *Id.* Likewise, a police officer did not engage in state action when she called 911 on a suspect who repeatedly

knocked on the door in the middle of the night. *Redding*, 241 F.3d at 531–33. Anyone has the power to call 911, and the officer did not perform any law-enforcement duties during this encounter. *Id.* at 533; *see also Blackwell v. Allen*, 2022 WL 17832191, at *8 (6th Cir. Dec. 21, 2022); *Burris v. Thorpe*, 166 F. App'x 799, 802 (6th Cir. 2006); *Corder v. Metro. Gov't of Nashville & Davidson County*, 1990 WL 33708, at *3 (6th Cir. Mar. 27, 1990) (per curiam).

That said, we must not take any analogy to private conduct too far. If the State does assign an official a duty to engage in an action as part of the official's state job responsibilities, "[i]t is irrelevant that he might have taken the same action had he acted in a purely private capacity[.]" *Griffin*, 378 U.S. at 135. The conduct will still qualify as state action even though the official could have performed the same task as a private party. *See Dean*, 354 F.3d at 553. For example, although any private person can complain to a state bar about an attorney, a bar official engages in state action if he makes a complaint while undertaking his official bar-related duties. *See id.*

### 2. Did Rising's conduct meet these state-action standards?

These principles foreclose Mackey's claim. The City of Adrian did not give Rising the authority to engage in the conduct that Mackey challenges in this suit. *See Lindke*, 601 U.S. at 198; *Dean*, 354 F.3d at 553. Our path to that conclusion starts by identifying the "nature of the act" at issue. *Stengel*, 522 F.2d at 441 (citation omitted). Recall that, shortly before the November 2017 election, Mackey published a Facebook post that described Rising as a "corrupt" politician and claimed that he had used cocaine and associated with a robber. Facebook Page, R.48, PageID 1401. Rising reacted to this post by calling Mackey's mother late at night. During this call, Rising allegedly threatened "Mackey and his family with bodily harm" by stating that "somebody is going to get hurt" if Mackey did not delete his critical commentary. Appellant's Br. 48; Mackey Aff., R.48, PageID 1288. Mackey argues that Rising's threat of physical violence violated the First Amendment because Rising made the threat in response to Mackey's political speech.

We thus must ask whether the alleged threat of violence qualified as the "type of authority" that the City vested in Rising as a City Commissioner. *Lindke*, 601 U.S. at 200.

While the question whether a particular task falls within an official's duties often requires "careful attention" to the governing state regulations or customs, *id.*, we find the answer obvious in this case. Rising served in Adrian's "legislative" body. Adrian City Charter § 4.1. Unlike police officers, legislators generally lack the power to wield the State's monopoly on the use of force. *See Wilson v. Price*, 624 F.3d 389, 393 (7th Cir. 2010); *Waters*, 242 F.3d at 356–57, 359–60.

Mackey also points to no Adrian-specific "statute, ordinance, regulation, custom, or usage" that might compel a different result here. 42 U.S.C. § 1983. Adrian gave its Commissioners the power to perform typical legislative tasks for the City (such as passing ordinances and budgets). Rising could not even perform these tasks alone. Rather, the Commission needed a "quorum" (defined as a "majority") "for the transaction of business at all commission meetings[.]" Adrian City Charter § 6.5; *cf. Waters*, 242 F.3d at 360. The City, by contrast, assigned its city administrator the authority "[t]o see that all laws and ordinances are enforced[.]" Adrian City Charter § 4.10(b). And it did not permit Commissioners to "give orders" to the City's administrative staff; Commissioners instead had to communicate with the executive branch exclusively through its city administrator. *Id.* § 4.7. Rising thus testified that he was not "carrying out" his "duties" as a City Commissioner either when he used his personal Facebook account to comment on Mackey's post or when he later called Mackey's mother about it. Rising Dep., R.48, PageID 1393. He instead made this call to protect his "reputation as a business owner" in Adrian. *Id.*, PageID 1378. Rising was not even seeking reelection at this time.

Nor can Mackey fall back on the claim that Rising's threat of violence qualifies as a "misuse" of the power that the City allowed him to exercise on its behalf. *Lindke*, 601 U.S. at 200. Even if the divide between the misuse of power and the absence of power can be difficult to draw, we see no difficulty here. Mackey identifies no legislative power that Rising's alleged threat could conceivably fall under. Critically, Mackey agrees that Rising threatened only *physical* harm—not the types of harm that legislators might inflict. For example, Mackey does not claim that Rising threatened to enact a harmful ordinance (or initiate a costly legislative investigation) as payback for the criticism. *Cf. Meadows*, 627 F. App'x at 501; *see also Evans v.*

*United States*, 504 U.S. 255, 260–61 (1992).  Mackey also does not claim that Rising ordered the police to remove Mackey during a Commission meeting under its rules of procedure. *Cf. Lozman*, 585 U.S. at 91–92.  Mackey instead claims that, apart from any official legislative task, Rising threatened to physically assault Mackey during a middle-of-the-night phone call. *Cf. Blackwell*, 2022 WL 17832191, at *7–9.  Rising lacked any power to make this type of threat on the City's behalf.  And "one cannot misuse power one does not possess."  *Wilson*, 624 F.3d at 393; *see Lindke*, 601 U.S. at 200.

Even if Rising lacked the power to *use force* for the City, Mackey responds, Rising had the power to *speak to residents* on the City's behalf outside official meetings.  To support this claim, Mackey notes that Rising testified that he used his personal cellphone interchangeably to make both government and private calls.  Rising distinguished between the two types of calls based on "the topic of the conversation[.]"  Rising Dep., R.48, PageID 1390.  And because the "topic" of Rising's conversation with Mackey's mother concerned Mackey's criticisms of Rising's service as a Commissioner, Mackey concludes that Rising must have spoken to her in his official capacity.

Mackey's "topic of conversation" approach to state action commits an error that the Supreme Court highlighted in *Lindke*.  Mackey puts the "focus on appearance" by asking whether Rising purported to talk about something government related.  601 U.S. at 199.  Yet, as *Lindke* explained in the social-media context, "[t]he appearance and function of the social-media activity are relevant at the second step, but they cannot make up for a lack of state authority at the first."  *Id.* at 198.  Here, too, Rising skips over the first crucial question: Was Rising "possessed of state authority"?  *Id.* at 199 (quoting *Griffin*, 378 U.S. at 135).  Mackey does not even *attempt* to identify some "statute, ordinance, regulation, custom, or usage" that gave Rising the authority to be the official voice of Adrian during phone calls with residents.  *Id.* at 200 (quoting 42 U.S.C. § 1983).  He merely assumes that Adrian gave Rising the power to speak to residents on the City's behalf based on Rising's testimony that he spoke about government topics over the phone.  Yet Rising cannot "conjure the power of the State through his own efforts"; Mackey must point to a source delegating this power to him.  *Id.* at 199.

Besides, even if we accept Mackey's claim that the City gave Rising "*some* authority" to speak to residents (say, about the status of pending legislation), Mackey must show that the speech he challenges fell within Rising's "bailiwick" as a Commissioner. *Id.* That is, for state action to exist, the state—or here, a state actor—must bear responsibility for "the *specific* conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis added). For two reasons, Mackey falls short here too. First, he suggests that we should consider what *motivated* Rising to make the call: Mackey's Facebook post. Yet Mackey wrote this post as part of his own political campaign for a Commission seat to influence the election. Mackey does not even try to explain why Rising's response to this *political* activity concerns *official* legislative business. Second, it is Rising's speech that counts for the state-action test, not Mackey's. We, for example, refused to treat an official's threat to bring a defamation suit as state action even when the official alleged that citizens had made false claims about his *government* service. *See Meadows*, 627 F. App'x at 497–98, 501; *see also Viola v. Yost*, 2023 WL 6222366, at *2 (6th Cir. June 12, 2023); *Gritchen*, 254 F.3d at 812–14. Because the defamation suit did not fall within the official's duties, it did not matter whether the topic of the suit did so. The same logic applies here: Whether or not Mackey's political Facebook posts motivated Rising's call, Rising's alleged threat of violence in response did not fall within his "bailiwick" as a Commissioner. *Lindke*, 601 U.S. at 199.

Mackey fares no better with his reliance on our cases about police officers. Those officers can act in their official capacities even when they use physical coercion (or the threat of coercion) while off the clock. *See Kalvitz*, 763 F. App'x at 495–96; *Barkovic*, 505 F. App'x at 500; *McGuire*, 295 F. App'x at 738–39; *Layne*, 627 F.2d at 13. Yet States normally give these officers the power to use force for the States in the exercise of their law-enforcement tasks. So these cases typically turn on the second element of the state-action inquiry: Did an officer "purport to use" the delegated "authority" when engaging in the challenged force? *Lindke*, 601 U.S. at 201; *see Dean*, 354 F.3d at 553. On the one hand, we have held that police officers purported to use that authority when they, for example, allegedly "announced themselves as officers" and placed the plaintiff "under arrest." *Kalvitz*, 763 F. App'x at 496. On the other hand, we have held that a police officer did not purport to use this authority when, for example, he broke up a late-night fight at a Waffle House without identifying himself. *Neuens v. City of*

*Columbus*, 303 F.3d 667, 669–71 (6th Cir. 2002); *see also Newell v. Huepenbecker*, 814 F. App'x 114, 116–17 (6th Cir. 2020); *Morris v. City of Detroit*, 789 F. App'x 516, 518 (6th Cir. 2019).

This debate is beside the point here. We need not consider the second element of the state-action test to reject Mackey's claim because he cannot get past its first element. Whether or not Rising purported to act in his official capacity, Adrian did not give him any authority to use (or threaten) physical force on its behalf. *Lindke*, 601 U.S. at 198; *Dean*, 354 F.3d at 553. So the City "cannot 'fairly be blamed'" for Rising's alleged threat to harm Mackey. *Lindke*, 601 U.S. at 199 (quoting *Lugar*, 457 U.S. at 936).

Lastly, Mackey alleges that he at least created a factual dispute over whether Rising made the threat in his official capacity. Admittedly, we often send cases to a jury when the question whether a defendant engaged in state action turns on a dispute about the historical facts (such as a dispute about what a police officer said). *See Layne*, 627 F.2d at 13; *see also Kalvitz*, 763 F. App'x at 496; *Barkovic*, 505 F. App'x at 500. At the same time, the ultimate (or mixed) question whether those historical facts rise to the level of "state action" within the meaning of the Constitution and § 1983 qualifies as a "legal issue" for the court. *Neuens*, 303 F.3d at 670; *see Yassin v. Weyker*, 39 F.4th 1086, 1089 n.2 (8th Cir. 2022) (citing cases); *cf. U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 n.4 (2018). And here, even after we resolve all disputes about the historical facts in Mackey's favor, we still must reach the "legal" conclusion that Rising's alleged threat of force was not state action. *Neuens*, 303 F.3d at 670.

*B. Can Rising raise his state-action defense?*

Even if Rising could have relied on the state-action defense at the outset, Mackey next claims that Rising's conduct during the litigation bars him from relying on the defense now. Mackey notes that the Michigan Constitution allows cities to collect and spend taxpayer dollars exclusively for public (not private) purposes. *See* Mich. Const. art. 7, §§ 21, 26. He adds that Michigan law allows a city to pay for the defense of an official only if a suit involves the official's "conduct in the course of employment with" the city or "actions taken on behalf of the" city. Mich. Comp. Laws § 691.1408(3). Given these provisions, Mackey argues that the

Liability Pool (and Adrian) could pay for Rising's defense only if he called Mackey's mother as a City Commissioner. So Mackey believes that Rising's decision to accept the Liability Pool's help prohibits him from later claiming that he called Mackey's mother in his personal capacity. To support this theory, Mackey invokes two equitable doctrines: waiver and judicial estoppel. But neither applies.

### 1. *Did Rising "waive" his state-action defense?*

Mackey first argues that Rising waived any right to assert a state-action defense by accepting the Liability Pool's funds. Under the well-known doctrine of "waiver" (in contrast to "forfeiture"), a party cannot assert a right in a suit if the party has intentionally relinquished the right. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)); *Bannister v. Knox Cnty. Bd. of Ed.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022).

This type of relinquishment can occur in different ways. Often, parties "explicitly" waive their rights through their statements. *Robertson v. U.S. Bank, N.A.*, 831 F.3d 757, 761 (6th Cir. 2016). We have held, for example, that a party waived an argument by disavowing it in an appellate brief. *See Bannister*, 49 F.4th at 1011. For some legal rights (especially in the criminal context), the law mandates this type of express waiver. *See Carson v. United States*, 88 F.4th 633, 645–46 (6th Cir. 2023). So criminal defendants cannot give up the right to a jury trial unless they (not their lawyers) personally effect this waiver. *See New York v. Hill*, 528 U.S. 110, 114 (2000).

Other times, though, parties can "constructively" waive their rights through their conduct. *Robertson*, 831 F.3d at 761. This type of waiver generally requires a party to take actions inconsistent with the right. *See Carson*, 88 F.4th at 646. We have held, for example, that a party waived the right to challenge an arbitration agreement's validity by demanding that the other side arbitrate a dispute under the agreement. *See PolyOne Corp. v. Westlake Vinyls, Inc.*, 937 F.3d 692, 697–701 (6th Cir. 2019); *see also Schwebke v. United Wholesale Mortg., LLC*, 96 F.4th 971, 975–77 (6th Cir. 2024). And we have suggested that a party may waive the right to remove a suit from state court to federal court by "filing a cross-claim or permissive counterclaim" in the

state-court proceedings. *Robertson*, 831 F.3d at 761; *cf. Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618–24 (2002). Because Rising does not dispute that our law would likewise permit this type of constructive waiver in this state-action context, we can assume the point.

Still, Mackey has failed to show that Rising either explicitly or constructively waived his state-action defense. For starters, Mackey makes no claim that Rising *expressly* said anything suggesting that he abandoned this defense. Rather, Rising raised the defense at every stage. In his answer, Rising denied the complaint's allegations that he had acted "under color of state law." Compl., R.1, PageID 3; *see* Answ., R.5, PageID 17. When responding to Mackey's motion to enjoin the use of public funds for his defense, Rising again reiterated his view that he "was not acting under color of state law when he called [Mackey's] mother." Resp., R.25, PageID 661. And, of course, he successfully moved for summary judgment on this precise state-action ground.

Next, Rising did not *constructively* abandon his state-action argument by engaging in conduct that conflicted with his assertion of the argument. To be sure, Rising convinced the Liability Pool to pay for his defense. The Liability Pool also had a duty to help Rising only if the "litigation" concerned his "conduct in the course of employment with" the City. Mich. Comp. Laws § 691.1408(3). But Rising has consistently maintained that the Liability Pool's duty to assist him under Michigan law depended on the factual *allegations* in Mackey's complaint—not the *real-world* facts that Rising sought to prove in discovery. And Mackey cannot dispute that his complaint's allegations triggered the Liability Pool's duty to defend Rising: It expressly pleaded that Rising had called Mackey's mother in his official capacity. Indeed, if Mackey had argued the contrary (that his complaint did *not* plausibly plead these facts), he would have all but admitted that the court should dismiss his § 1983 claim for failing to satisfy its state-action element.

Background principles of Michigan insurance law support Rising's view that he could *both* ask the Liability Pool to defend him *and* assert that he did not call Mackey's mother in his official capacity. An insurer must defend an insured in Michigan whenever the complaint's allegations (if accepted) "arguably" fall within an insurance policy. *Matouk v. Mich. Mun.*

*League Liab. & Prop. Pool*, 907 N.W.2d 853, 858 (Mich. Ct. App. 2017) (citation omitted); *Radenbaugh v. Farm Bureau Gen. Ins. Co. of Mich.*, 610 N.W.2d 272, 275 (Mich. Ct. App. 2000); *Royce v. Citizens Ins.*, 557 N.W.2d 144, 146–47 (Mich. Ct. App. 1996). This duty to defend exists even if evidence later shows that the complaint made "groundless" allegations. *Matouk*, 907 N.W.2d at 858 (citation omitted). So an insured does not confess to a complaint's allegations of misconduct simply by arguing that those allegations trigger an insurer's duty to defend. And Rising's acceptance of the Liability Pool's funds (which depended on the alleged facts) did not conflict with his state-action defense (which depended on the actual facts). He thus did not engage in any inconsistent conduct that could have "constructively" waived this defense. *Robertson*, 831 F.3d at 761.

Mackey's responses do not change things. He first argues that Michigan's general insurance-law principles cannot apply in this public-employee context because of the laws barring cities from paying for their employees' defense in suits against them in their private capacities. We have found no cases that support his reading of Michigan law. Yet we need not enter this state-law debate. For waiver purposes, it is enough that Rising has always maintained the same position: that he did not act under color of state law, but that the Liability Pool must assist him because of the complaint's allegations that he did. Perhaps Rising misreads state law. Perhaps not. But that (alleged) error would not show that he intentionally relinquished his state-action defense. *See Morgan*, 596 U.S. at 417. So it would not establish waiver.

Mackey next argues that he at least created a genuine issue of material fact over a question about Rising's state of mind: Did Rising *knowingly* decide to abandon his state-action defense by accepting the Liability Pool's funds? Mackey thus suggests that a jury must resolve this waiver question. But the case he cites involved a *state-law* waiver issue. *See Chrysler Credit Corp. v. H & H Chrysler-Plymouth-Dodge, Inc.*, 927 F.2d 270, 274 (6th Cir. 1991). It is not obvious that the same principles should apply to Mackey's *federal-law* waiver claim. A jury, for example, does not decide whether a party has "waived" the right to move for judgment as a matter of law under Federal Rule of Civil Procedure 50 by failing to seek that relief before the case goes to the jury. *See Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426 (6th Cir. 2004). In that context, moreover, we have held that waiver presents a mixed question of law and

fact and that we review de novo a district court's ultimate waiver conclusion. *See id.*; *see also Schwebke*, 96 F.4th at 973–74. In all events, the standard of review does not matter here. Even if we treat waiver as a pure question of fact, Rising's acceptance of the Liability Pool's assistance would not permit any reasonable factfinder to conclude that he knowingly abandoned his state-action defense.

## 2. *Does judicial estoppel bar Rising's state-action defense?*

Mackey alternatively argues that the district court should have judicially estopped Rising from raising his state-action defense. The equitable doctrine that goes by "judicial estoppel" prohibits a litigant from convincing a court to adopt one position at one time and then seeking the opposite position at a later time. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). We typically apply judicial estoppel when a party takes conflicting positions across different cases. *See Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 545–48 (6th Cir. 2014). But the Supreme Court has suggested that it can apply at different "phase[s]" of a single case. *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000). We can assume the point. Mackey invokes this use of estoppel, claiming that Rising has taken inconsistent positions in this case. At an early stage, Rising successfully rebuffed Mackey's request that the court enjoin Rising from using the Liability Pool's funds on the ground that Michigan law reserved those funds for city employees acting in their official capacity. At the summary-judgment stage, though, Rising asserted that he did not call Mackey's mother in his official capacity.

Although three factors guide our judicial-estoppel inquiry, we need not go past the first one here. The first factor requires Mackey to show that Rising's summary-judgment position "clearly" contradicted his earlier position. *New Hampshire*, 532 U.S. at 750 (citation omitted). Because we apply judicial estoppel cautiously, we must reject the doctrine as long as Rising has arguably reconciled his two allegedly inconsistent positions. *See Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757–58 (6th Cir. 2008); *see also Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 382 (6th Cir. 1998). And he has easily reconciled those positions for the reasons we have explained. Rising successfully defended against Mackey's motion to enjoin him from using public funds because Mackey's own *allegations* suggested that he had acted as a City Commissioner. He later successfully obtained summary judgment

because the undisputed *evidence* showed that he had acted in his personal capacity. The first position depended on allegations; the second on proof. Rising's positions thus lacked any "inconsistency," let alone a "*clear* inconsistency." *Lorillard*, 546 F.3d at 758; *cf. Butler v. United Healthcare of Tenn., Inc.*, 764 F.3d 563, 570 (6th Cir. 2014).

Mackey counters with another state-law argument. When finding no inconsistency between Rising's two positions, he says, the district court misread the Michigan appellate court's decision in *Matouk*. *Matouk* held that the Liability Pool's duty to defend a city employee in a § 1983 case did not arise merely because the complaint contained one conclusory allegation that the employee had acted in his official capacity. 907 N.W.2d at 863–64. The court reasoned that the duty to defend does not depend on the "labels" that the plaintiff uses in a complaint. *Id.* at 863 (citation omitted). According to Mackey, this analysis means that the court must determine the *actual* facts when deciding whether an insurer has a duty to defend. Again though, we fail to see how this state-law argument supports Mackey's judicial-estoppel claim. Even if Rising misread *Matouk*, that (alleged) error would not show that he took inconsistent positions. And regardless, it is Mackey who misreads *Matouk*. The case held only that a court must look to the "complaint as a whole" when deciding whether an insurer has a duty to defend. *Id.* (citation omitted). But it still looked only to the complaint's "allegations"—not to actual facts outside the complaint. *Id.*

We affirm.