*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0046P (6th Cir.)
File Name: 01a0046p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KATHRYN M. WATERS,
    *Plaintiff-Appellant,*

    *v.*

CITY OF MORRISTOWN,
TENNESSEE; MERLIN E.
SHUCK, individually
and in his official capacity
as a Morristown
Alderman/Morristown City
Councilman; JERRY GRAHAM,
individually and in his official
capacity as Lieutenant in the
Morristown Police
Department,
    *Defendants-Appellees.*

No. 00-5019

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
Nos. 94-00077—Thomas G. Hull, District Judge.

Argued: January 31, 2001

Decided and Filed: February 22, 2001

Before:  DAUGHTREY and GILMAN, Circuit Judges;
            HEYBURN, District Judge.[*]

---

**COUNSEL**

---

**ARGUED:**   James R. Moore, MOORE & BROOKS, Knoxville, Tennessee, for Appellant.  Pamela L. Reeves, WATSON, HOLLOW & REEVES, Knoxville, Tennessee, Denise T. Stapleton, TERRY, TERRY AND STAPLETON, Morristown, Tennessee, for Appellees. **ON BRIEF:** James R. Moore, MOORE & BROOKS, Knoxville, Tennessee, Judith Elaine Burke, TOPPENBERG & BURKE, Knoxville, Tennessee, for Appellant.  Pamela L. Reeves, WATSON, HOLLOW & REEVES, Knoxville, Tennessee, Denise T. Stapleton, TERRY, TERRY AND STAPLETON, Morristown, Tennessee, for Appellees.

---

**OPINION**

---

   RONALD LEE GILMAN, Circuit Judge.   Kathryn M. Waters brought suit against Veterinarian and City Alderman Merlin E. Shuck, Police Officer Jerry Graham, and the city of Morristown, Tennessee pursuant to 42 U.S.C. § 1983, contending that they had  unlawfully deprived Waters of her constitutionally protected rights.  The district court granted the defendants' motion for summary judgment, concluding that Dr. Shuck had not acted under color of state law when he harassed and abused Waters, that Officer Graham was entitled to qualified immunity, and that Waters had failed to establish any custom or policy that would trigger the city of Morristown's liability.  Waters now challenges that decision.

---

[*]The Honorable John G. Heyburn II, United States District Judge for the Western District of Kentucky, sitting by designation.

For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

From January of 1992 through May of 1993, Waters worked as a veterinary assistant at Dr. Shuck's Morristown Animal Hospital. During this entire period of time, Dr. Shuck was both a licensed veterinarian and a Morristown city alderman. Waters and Dr. Shuck became involved in a personal relationship sometime after her employment commenced at the animal hospital, and Dr. Shuck began to exert increasing control over Waters's life. Dr. Shuck insisted as a condition of Waters's continuing employment that she attend his church, stop drinking excessively, and leave her husband, who was also a heavy drinker.

In January of 1993, Dr. Shuck allegedly confined Waters to his animal hospital for approximately ten days in an attempt to prevent her from drinking. Although she had access to several telephones inside the animal clinic, Waters did not report the incident to the police. Instead, she used the phones to call relatives and even to have the local taxi company deliver beer to her on one occasion. Waters had the ability to escape because Dr. Shuck frequently left the back door unlocked so that she could smoke outside. She finally left through the unlocked back door one evening when she called the taxi company to retrieve her.

Following this incident, Waters felt the need to separate herself from Dr. Shuck. She did so by visiting with her children in Florida. Dr. Shuck provided the money for a one-way plane ticket and even drove Waters to the airport. Waters claims that Dr. Shuck then began making repeated telephone calls to her in Florida, urging her to return to Morristown to settle her affairs and threatening to send down the Morristown police chief to have her arrested. After she agreed to return to Morristown, Dr. Shuck sent her a return airline ticket.

On the evening of February 26, 1993, while Dr. Shuck was out of town, Waters went into the animal hospital to check on the animals. A hospital employee saw Waters and notified the police that Waters, who was no longer a permanent employee, was trespassing. Waters had already been drinking heavily that day. The police arrested Waters for public intoxication and criminal trespass, and confiscated as potential evidence a key to the clinic, her car's distributor wire, and $150 in cash, all of which were found on her person. Although the police returned the distributor wire and money to Waters, the key was given to Dr. Shuck because it belonged to the animal hospital. Upon Dr. Shuck's return to Morristown, he had the trespass charges dismissed and informed the police he did not want to pursue the matter.

Early the next morning, the local taxi company was cited by the Morristown police for violating several of Hamblen County's taxicab regulations. The police found that one of its cabs had dysfunctional tail lights, lacked a rate meter, and had an invalid permit. Waters alleges that this was the only time that the taxi company had ever been inspected by the police and, because of its proximity to her arrest and to the confiscation of her car's distributor wire, demonstrated a concerted effort by the Morristown police to restrict her ability to travel.

In March of 1993, Dr. Shuck allegedly went to Waters's apartment and became upset when he found her drinking. Waters contends that he slapped her across the face with such force that her dentures broke. Later that same month, Dr. Shuck purportedly caught her drinking again. This time, Waters claims that he hit her on the head with a liquor bottle and then took her back to his animal hospital to suture the wound. Still another assault took place on April 18, 1993, when Dr. Shuck allegedly struck Waters and broke her nose. Waters did not report any of these incidents to the police.

During this period of time, Waters contends that Dr. Shuck used his position as a Morristown alderman to have the police

the sworn statement that Waters gave to his attorneys in return for the $1,500. The district court referred the discovery matter to a magistrate judge, who determined that Waters's notice should be quashed and her motion denied because she had failed to establish any justification to pierce the attorney-client privilege or to disqualify the attorneys after they had represented Dr. Shuck in this matter for six years.

The discovery rules vest broad discretion in the trial court. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998). "An order denying further discovery will be grounds for reversal only if it was an abuse of discretion resulting in substantial prejudice." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 401 (6th Cir. 1998).

Waters claims that because the findings in the district court's summary judgment order mention the May 1993 statement, that the circumstances surrounding the matter are somehow material to the final disposition of her case. There is no basis for this contention. Although she argues that the district court's findings are in direct contradiction to her version of these events, she is unable to cite to the record in support of this assertion. Waters, in fact, admitted in pretrial discovery that she had accepted $1,500 from Dr. Shuck in exchange for her alleged recantation. Furthermore, Waters was not prejudiced by the district court's ruling on this discovery matter because its decision to grant summary judgment was based on grounds wholly unrelated to her May 1993 statement. We therefore conclude that the district court's decision to quash the notice to depose Dr. Shuck's counsel was not an abuse of its discretion.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

Waters also attempts to establish the city's liability by alleging that the police conspired with Dr. Shuck to violate her constitutionally protected rights. First, she cites the incident in February of 1993 when she was arrested for public intoxication and trespass while at Dr. Shuck's animal hospital after hours. She claims that the police confiscated her property and then turned it over to Dr. Shuck. The record, however, shows that the police returned her cash and her car's distributor wire to Waters, giving Dr. Shuck only the key that she had used to enter the animal hospital. She next contends that the police arrested her for public intoxication, even though the police report allegedly failed to indicate that the elements of the crime were met. This, too, is incorrect. The police report clearly states that she was intoxicated. Waters, in fact, admitted that she was drinking at the time. Furthermore, when Dr. Shuck returned to town, he had the charges against her dismissed.

Waters finally cites the events surrounding the May 8, 1993 incident. Her claim, however, fails to acknowledge that she told the responding officers that she did not wish to prosecute Dr. Shuck and that she never asked for their assistance. Now she claims that they failed to adequately protect her, even though they had no reason to know of Dr. Shuck's pattern of harassment. From these facts, Waters is unable to establish that any policy or custom attributable to the city was the moving force behind her injuries.

**E. The district court did not err when it quashed Waters's notice to depose Dr. Shuck's counsel**

Waters's final argument is that the district court erred when it quashed her notice to depose Dr. Shuck's counsel concerning the sworn statement that she provided them in May of 1993. Waters originally filed this notice, along with a motion for their recusal, in response to Dr. Shuck's Motion for Judgment on the Pleadings, which alleged that the entire lawsuit should be dismissed because of Waters's unclean hands, illegality, and fraud. Dr. Shuck's claim was based on

track her whereabouts. When the owner of the local taxi company refused to tell Dr. Shuck where Waters had been driven on a particular occasion, he allegedly had the police find out the information for him. Then, on April 4, 1993, Dr. Shuck purportedly had the police department issue a "BOLO" (Be On the Lookout) for Waters. Nothing ever came of the inquiry. Waters was not aware at the time that it had occurred, and the police chief denied that the department ever issued such a bulletin.

A few days later, Dr. Shuck again contacted the taxi company and allegedly threatened to use his influence as a city alderman to have its operating license revoked if it continued to transport Waters. Despite these alleged threats, the taxi company continued to drive Waters around town. The owner of the company stated that she would continue to serve whoever needed transportation. In addition, the defendants pointed out that aldermen do not possess individual authority over licensing procedures for the local taxi companies under the Morristown City Charter, but must act in concert with at least two other members of the Council to take any action.

The next altercation between Dr. Shuck and Waters occurred on May 8, 1993. Dr. Shuck allegedly broke into Waters's apartment while she was out and rummaged through her belongings. He purportedly left a note stating that Waters had turned his life upside down, so he was now going to do the same to her. For the first time since the abuse began, Waters contacted the police. She told the responding officers that she suspected that Dr. Shuck was the perpetrator and that she was afraid of him. She declined, however, to make a formal complaint. One of the officers later testified that the presence of the overturned furniture was suspicious and looked staged. The officer also stated that Waters appeared to have been drinking when they questioned her about the incident.

Later that day, the police received a 911 call reporting a second disturbance involving Dr. Shuck. He was reported to have broken into an apartment belonging to one of Waters's friends, Robert Cadman, in search of her. Both Waters and Cadman were asleep inside the apartment when Dr. Shuck arrived. Officer Graham was among the officers who responded to the call. When he arrived at the scene, Waters was visibly intoxicated. Waters claims that Graham allowed Dr. Shuck to control the police investigation and was permitted to take her back to her apartment while the police drove her car there. Officer Graham, however, testified that he asked Waters whether she was okay and if she wanted to leave with Dr. Shuck. He claims that she responded affirmatively, telling him that Dr. Shuck always took care of her. When Waters was later asked about these events, she admitted that the details were "real fuzzy," that she "had enough alcohol in [her] . . that [she] could not see very well," and that she never told the police she did not want to go with Dr. Shuck. Cadman informed the police that he would let the city of Morristown decide whether to prosecute because he was not sure if he wanted to pursue the matter.

On May 10, 1993, two Morristown police officers followed up with Waters concerning the incident. When they informed Waters that she could press charges against Dr. Shuck, she specifically told them that she did not wish to prosecute. Waters admitted that the police officers encouraged her to pursue the matter and repeatedly told her that they were there to protect her, not Dr. Shuck. She did agree, however, to give the police a statement, detailing some of the abuse that she had suffered at the hands of Dr. Shuck.

After the detectives left her home, Waters contacted Dr. Shuck. She demanded and received $1,500 in exchange for recanting her statement to the police. When Waters was later questioned under oath by Dr. Shuck's attorneys, she disavowed her previous allegations against him and testified that she had felt pressured by the police to make an official report.

*Brown*, 520 U.S. 397, 404 (1997). Municipal liability cannot be based on the theory of respondeat superior. *See Monell*, 436 U.S. at 691.

A governmental entity is liable for an official's unconstitutional actions when that official has the final authority to establish municipal policy with respect to the action ordered. *See Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). The authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). To determine whether final authority to make municipal policy is vested in a particular official, the court must look to state law. *See id.* at 125.

Waters's claim against the city of Morristown is based solely on the actions of Dr. Shuck and Officer Graham, alleging that they were "acting independently and on behalf of Defendant City of Morristown." She contends that the city should be held liable because Dr. Shuck worked at the highest level of government and had direct authority over the police department and taxi operators. Waters, however, did not introduce any evidence to show that Dr. Shuck's actions were taken with any knowledge of the city. As stated earlier, the Morristown City Charter, which establishes final decisionmaking power for the city, clearly states that a single alderman lacks such authority. All decisions require a concurrence of three-fifths of the council. Furthermore, the charter shows that Dr. Shuck had no authority as an alderman to be engaged in police functions or taxicab regulations. Any actions of Dr. Shuck regarding these matters were so far beyond the scope of his responsibilities as an alderman that they would negate any causal link between the city's conduct and Waters's rights.

objectively unreasonable. In *Malley v. Briggs*, 475 U.S. 335, 341 (1986), the Supreme Court stated that "all but the plainly incompetent or those who knowingly violate the law" are protected by the qualified immunity defense. Immunity applies if reasonable officials could disagree on whether the public official could have reasonably believed that his conduct was lawful. *See Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992). Here, Waters cannot establish that Officer Graham's actions were unreasonable. When Graham was investigating the May 8, 1993 incident, Waters herself failed to alert him about the potential danger presented by Dr. Shuck. We therefore agree with the district court's conclusion that Graham's actions in allowing Waters to leave with Dr. Shuck and in Graham himself driving her car back to her apartment do not rise to the level of unreasonable conduct or an arbitrary exercise of power.

Finally, Waters failed to present any evidence that would indicate that Graham was aware of – let alone that he conspired to conceal – Dr. Shuck's abuse of Waters before she first reported it to the police in May of 1993. Waters's claims against Officer Graham are therefore without merit, and we affirm the district court's order granting him summary judgment on the basis of qualified immunity.

**D.    The district court did not err in concluding that Waters's alleged civil rights violations were not the result of any policy or custom attributable to the city of Morristown**

To hold a municipality liable for a violation of § 1983, a plaintiff must show that the constitutional violation resulted from a governmental policy or custom. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Supreme Court has recently emphasized that such a showing requires demonstrating a "direct causal link" between official action and the deprivation of rights, such that the "deliberate conduct" of the governmental body is the "moving force" behind the alleged injury. *See Board of County Comm'rs v.*

Dr. Shuck continued his harassment and abuse throughout the next six months. On December 16, 1993, Dr. Shuck was arrested for conspiracy to kidnap Waters and her former husband, whom she had divorced by then, and for conspiracy to murder Lawrence Myers, the editor of the local newspaper who had written a series of front-page articles detailing Dr. Shuck's abuse of Waters. *See State v. Shuck*, 1996 WL 45194 (Tenn. Crim. App. 1996). When Dr. Shuck was arrested, the police found documents concerning the May 1993 incidents in Dr. Shuck's desk. The parties dispute whether the documents were the originals or only copies of the Morristown Police Department's file.

Dr. Shuck was convicted in state court on one count of solicitation to commit first-degree murder and two counts of solicitation to commit aggravated kidnapping. His conviction was eventually overturned on the basis that the trial court had committed reversible error when it excluded the testimony of an expert psychological witness offered to support Dr. Shuck's entrapment defense. *See State v. Shuck*, 953 S.W.2d 662 (Tenn. 1997).

**B.    Procedural background**

In February of 1994, Waters filed suit pursuant to 42 U.S.C. § 1983, alleging that Dr. Shuck, City Alderman Bruce Sluder, Officer Graham, and the city of Morristown violated her rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. She also asserted several state-law causes of action. The district court entered an order on May 19, 1994 to stay the case pending the resolution of the criminal charges against Dr. Shuck. After numerous proceedings in the criminal case, the district court lifted the stay on June 17, 1997. Sluder was voluntarily dismissed from the case in February of 1999.

Dr. Shuck, Officer Graham, and the city of Morristown then moved for summary judgment on all claims. On December 6, 1999, the district court granted their motion and dismissed the

case, finding that Dr. Shuck's actions fell outside the scope of § 1983 because they were not taken under color of state law, that Officer Graham was entitled to qualified immunity because he had acted reasonably and did not violate clearly established law, and that Waters could not demonstrate any policy or custom attributable to the city of Morristown that would trigger its liability. The district court also declined to exercise supplemental jurisdiction over Waters's state-law claims.

Waters filed a timely appeal of the district court's decision to grant summary judgment, to quash Waters's notice to depose Dr. Shuck's attorneys, and to deny her motion for their recusal. These latter pleadings related to the statement that Waters gave to Dr. Shuck's counsel in May of 1993 when she recanted her sworn statement to the police.

## II. ANALYSIS

### A. Standard of review

We review de novo the district court's grant of summary judgment. *See*, *e.g.*, *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Waters seeks to hold Officer Graham liable for issuing a "BOLO" for her, for allowing Dr. Shuck to "control the investigation" of the May 8, 1993 incident, and for allegedly conspiring to coverup Dr. Shuck's actions by denying that Graham had signed the citation against the local taxi company. Essentially, she contends that he violated her rights to privacy and to be free from detention and unreasonable search and seizure.

Upon review, however, it is not clear that Officer Graham deprived Waters of *any* constitutionally protected right. First, she admitted that she had no personal knowledge of a "BOLO" or of Officer Graham's alleged involvement. Even if the police had issued an improper "BOLO" for Waters, she suffered no resulting harm. She was never picked up or questioned by any law enforcement officer. Furthermore, she did not learn of its alleged existence until after the criminal proceedings began against Dr. Shuck.

Regarding the May 8, 1993 incident, Waters told Officer Graham that she did not wish to make a formal complaint against Dr. Shuck. Officer Graham had no way of knowing about Dr. Shuck's earlier inappropriate conduct because Waters had never reported any prior incidents of abuse. Although Graham did allow Waters to leave with Dr. Shuck while Graham personally drove her car back to her apartment, Graham testified that she told him that she wanted to leave with Dr. Shuck because Shuck always protected her. When Waters was later questioned about these events, she admitted that the details were fuzzy, that she could not see well because she was so intoxicated, and that she never told the police she did not want to go with Dr. Shuck. Waters therefore failed to demonstrate the violation of any clearly established constitutional rights.

Even if Waters were able to establish that Officer Graham had violated her rights, her claim would not survive the second prong of the qualified immunity analysis, which imposes liability only if his actions are shown to be

fondled one of the women while wearing his judicial robes. *See id.* at 1400. Unlike Dr. Shuck, Lanier would not have been in the same position to abuse his victims except for his official status as a state-court judge. Dr. Shuck, on the other hand, would have been able to pursue his harassment of Waters because of their close personal relationship and because of his status as her employer, even if he had not been a city of Morristown alderman.

Dr. Shuck may indeed be liable to Waters pursuant to her state-law claims. But in the absence of any credible evidence that Dr. Shuck's official position played a meaningful role in allowing him to harass and abuse Waters, her § 1983 claim against him must fail. We therefore affirm the district court's order granting summary judgment to Dr. Shuck.

### C.    The district court did not err in holding that Officer Graham was entitled to qualified immunity

The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, the first step in any qualified immunity analysis is to determine whether a clearly established statutory or constitutional right has been violated. In other words, "for a plaintiff to make a successful § 1983 claim, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996) (internal citation omitted). If a constitutional violation has occurred, then the plaintiff must assert "sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994).

### B.    The district court did not err in holding that Dr. Shuck's actions were not taken under color of state law

The district court held that Dr. Shuck did not act under color of state law when he harassed and abused Waters. It found that Dr. Shuck's actions were taken in pursuit of his personal relationship with her and were wholly unrelated to his position as a city alderman. To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States. *See Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The court must therefore determine, as a threshold matter, whether Dr. Shuck acted under color of state law.

Section 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office. *See West v. Atkins*, 487 U.S. 42, 49-50 (1988) ("The traditional definition of acting under color of state law requires that the defendant . . . exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.") (internal citation and quotation marks omitted). A person "acts under color of state law when he abuses the position given to him by the state." *Id*. at 50. The key determinant is whether the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law. *See id.* Logically, then, not every action undertaken by a person who happens to be a state actor is attributable to the state. Although "under 'color' of law means under 'pretense' of law," the acts of state officials "in the ambit of their personal pursuits" do not constitute state action. *See Screws v. United States*, 325 U.S. 91, 111 (1945) (holding that the defendants – a Georgia sheriff, a policeman, and a special deputy – acted under color of state law when they arrested and then beat to death a young African-

American in order to protect themselves and to keep him from escaping).

Accordingly, a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law. *See McNeese v. Vandercook*, No. 97-6512, 1999 WL 133266, * 2 (6th Cir. Feb. 25, 1999) (unpublished table decision) (holding that a deputy sheriff who struck a fellow deputy did not act under color of state law); *Mooneyhan v. Hawkins*, No. 96-6135, 1997 WL 685423, *4 (6th Cir. Oct. 29, 1997) (unpublished table decision) (holding that a police officer did not act under color of state law when he took advantage of his friendship with the plaintiff, not his authority as a police officer, to rape her); *D.T. by M.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176, 1188 (10th Cir. 1990) (holding that a teacher who molested three students at a basketball camp during summer vacation had not acted under color of state law). For the purposes of a state-action analysis, there can be no pretense of acting under color of state law if the challenged conduct is not related in some meaningful way either to the actor's governmental status or to the performance of his duties. *See Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 126 (1st Cir. 1999). The conduct allegedly causing the deprivation of a constitutional law must be "fairly attributable" to the state. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

Dr. Shuck's conduct in this case, though reprehensible, was not action taken under color or pretense of state law. Even when viewed in the light most favorable to Waters, the facts demonstrate that Dr. Shuck was pursuing his purely personal, private interests. The proof shows that Dr. Shuck, at most, was occasionally "throwing his weight around" on peripheral matters that did not go to the heart of his harassing conduct. This is not enough to establish liability under § 1983. Because of the close personal relationship between Waters and Dr. Shuck and his status as her employer, he would have been in the same position to harass and abuse Waters even if he had not been a city alderman.

Waters claims that, but for his position of authority and influence, Dr. Shuck would not have been able to threaten the taxi company, have the police department track and issue "BOLOs" for her, or allegedly control the police investigation. None of these actions, however, fell under his responsibility as an alderman. Nor were they done in furtherance of any city business. Furthermore, the Morristown City Charter clearly states that three-fifths of the city council must concur in order to take action on behalf of the city.

Waters is also unable to provide any credible evidence to substantiate her claims that *but for* Dr. Shuck's status as an alderman, he would not have been able to pursue these misdeeds. Throughout her briefs, she neglects to cite to the record in support of these assertions. In the few instances where she refers to the depositions of Morristown police officers, their statements demonstrate that they in fact did not view Dr. Shuck as having any authority, that they would have assisted any Morristown citizen in tracking down the whereabouts of friends and relatives, and that his attempts to issue "BOLOs" for Waters were treated as a joke. Finally, the taxi company continued to drive Waters, paying no heed to Dr. Shuck's threats to have its license revoked.

This case is very different from the one presented to this court in *United States v. Lanier*, 73 F.3d 1380 (6th Cir. 1996) (en banc), *vacated on other grounds by* 520 U.S. 259 (1997). Lanier, the only chancellor and juvenile court judge in two Tennessee counties, was found guilty under 18 U.S.C. § 242 of using his official position to coerce sexual favors from various women who appeared before him. All of Lanier's victims had business with the court, either as litigants, court personnel, or participants in court-related programs. Furthermore, all of the attacks took place in Lanier's chambers during working hours. *See id.* at 1397. Lanier even