RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

HOLLY LAWSON,

        *Plaintiff-Appellant*,

    *v.*

KAYLA CREELY, individually; LORI FRANKE, individually, MARK KOPP, in his individual and official capacities; FRANKLIN COUNTY, KY BOARD OF EDUCATION,

        *Defendants-Appellees*.

No. 24-5649

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:22-cv-00023—Gregory F. Van Tatenhove, District Judge.

Argued: January 29, 2025

Decided and Filed: March 26, 2025[*]

Before: COLE, WHITE, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC Covington, Kentucky, for Appellant. Elizabeth A. Deener, LANDRUM & SHOUSE LLP, Lexington, Kentucky, for Appellees Creely and Franke. Grant R. Chenoweth, PORTER, BANKS, BALDWIN & SHAW, PLLC, Paintsville, Kentucky, for Appellees Kopp and the Board. **ON BRIEF:** Christopher Wiest, Theodore J. Roberts, CHRIS WIEST, ATTY AT LAW, PLLC Covington, Kentucky, Thomas B. Bruns, BRUNS CONNELLL VOLLMAR & ARMSTRONG, Cincinnati, Ohio, for Appellant. Elizabeth A. Deener, LANDRUM & SHOUSE LLP, Lexington, Kentucky, for Appellees Creely and Franke. Grant R. Chenoweth, PORTER, BANKS, BALDWIN & SHAW,

───────────────

[*]This decision was originally filed as an unpublished opinion on March 26, 2025. Following an unopposed motion by certain Defendants-Appellees, the court has now designated the opinion for publication.

PLLC, Paintsville, Kentucky, for Appellees Kopp and the Board.  Samuel L. Jackson, Sara D. Naylor, SPENCER FANE LLP, Nashville, Tennessee, for Amici Curiae.

————————————

**OPINION**

————————————

HELENE N. WHITE, Circuit Judge.  Plaintiff-Appellant Holly Lawson appeals the grant of summary judgment to Defendants-Appellees in this 42 U.S.C. § 1983 action asserting that Lawson's public-school coworkers, Defendants-Appellees Kayla Creely and Lori Franke, together with Defendants-Appellees School Superintendent Mark Kopp and the Franklin County, Kentucky Board of Education (the Board),[1] violated her Fourth Amendment rights. We **AFFIRM**.

## I.  Facts

Lawson began working as a guidance counselor at Franklin County High School in 2016. Franke and Creely also worked at the school as a registrar and freshman guidance counselor, respectively.  Kopp was the superintendent of this school and others.  Over the May 1, 2021, weekend, Lawson attended a party for the Kentucky Derby, to which she brought her handgun. On the way back from the event on Sunday, May 2, she placed her handgun in a large purse or tote bag.  She did not unpack that bag Sunday night and took it with her from Monday, May 3, through Wednesday, May 5, including to the school.

Lawson was prescribed, and took, various medications for anxiety and back-and-knee issues.  On Monday, May 3, Creely observed Lawson taking medication and acting "in somewhat of a manic state."  R. 38, PageID 714.  Creely "was concerned for her behavior," which Creely viewed as "out of the ordinary."  *Id.* at 715.  Specifically, Creely was "concerned for students" and doubted whether Lawson could provide "whatever resources a student that needed to see her was in need of."  *Id.*  Franke testified that Lawson "seemed . . . overly excited" but that Franke "had seen it before in Ms. Lawson's actions."  R. 39, PageID 855.  Lawson's

———

[1]The Board noted below that by statute, its legal name is the "Board of Education of Franklin County, Kentucky."  R. 51, PageID 1487 n.2.

behavior nonetheless led Franke to "wonder[] if she was feeling okay." *Id.* The next day, May 4, Creely believed that Lawson was now "sluggish" and "intoxicated" because she could not communicate complete thoughts and was "babbl[ing]" in conversation. R. 38, PageID 717–18. Creely testified that Lawson did not "smell of alcohol," however, Creely confirmed that Lawson was "slurring her words." *Id.* at 718. At lunch on May 4, Creely again observed Lawson taking medication. *Id.* at 720. Similarly, Franke observed Lawson speaking "thick tongued"—*i.e.*, "[h]er words smeared [together]." R. 39, PageID 857.

After lunch, around 1:30 p.m., Lawson left the guidance counselors' suite of offices. Franke asked Creely if Lawson had told Creely where she was going, to which Creely said, "No." R. 38, PageID 726. Creely attempted to see if Lawson's car was still in the portion of the parking lot visible from Creely's office window. Creely and Franke then went to look at the lot from the vantage of Lawson's office window. According to Lawson, she had closed and locked her office door, presumably requiring Creely and Franke to use their keys—which worked on every door in the guidance counselors' suite of offices—to access Lawson's office. Lawson also testified that her bag was not visible from the far side of her desk, suggesting that Creely and Franke must have walked into her office and around her desk. Upon seeing Lawson's bag, Creely told Franke that she "wanted to know what [Lawson] was taking," referring to Lawson's medications. *Id.* at 728. Creely then unlatched the bag, saw a few amber-colored prescription bottles on top, and read the bottles' labels out loud. When Creely placed the last bottle back in the purse, she noticed what appeared to be the handle of a handgun. After she told Franke, Franke leaned over the desk and also saw "like the end of the handle or the butt of a handgun." R. 39, PageID 865. Creely did not touch the firearm, and the two left Lawson's office. They did not immediately report their discovery and returned to work.[2]

Later that day, Creely met with Ashley Reid, a social worker, about an unrelated issue and reported her concerns about Lawson's behavior earlier that day. Reid invited Franke to join them in Creely's office, and Franke confirmed Creely's account. Creely then added that they

---

[2]Creely's and Franke's testimony differs from Lawson's, though the factual disputes are ultimately immaterial to our disposition of this case. Creely testified that Lawson had left her office door ajar; that Creely could see Lawson's bag from the hallway; and that Lawson left the bag open, not latched. (Franke's account did not differ materially from Creely's.)

had found a firearm in Lawson's purse. At that point, the group saw Lawson return to her office before leaving again a few minutes later. Reid said that she would have to report the firearm to the authorities and did so that same day. She contacted her immediate supervisor as well as the law-enforcement officer designated as the School Resource Officer, Marvin Kelly, who in turn informed Jeff Abrams, an officer designated as the Safety Coordinator for the county's schools. As the May 4 school day came to an end, Reid's supervisor and Abrams informed Superintendent Kopp of the situation. By that time, Lawson had left for the day, and Kopp preferred to discuss the situation with her in person.

The next day, May 5, Lawson returned to the school with her bag (still containing the firearm) and was met at the entrance by Kopp. Kopp asked Lawson if he could "talk to [her] for a second," and after she agreed, he walked her to Kelly's office, where Kelly and Abrams waited. R. 40, PageID 1019; R. 36, PageID 459; R. 36-40, PageID 613. Kelly and Abrams carried their firearms and wore shirts with a sheriff's crest. Kopp stood in front of the office door, advised Lawson that he had received a report that she possessed a weapon on school grounds, and asked her if that was true. In Lawson's recollection of events, she stated that she was unsure; she asked Kopp if she "need[ed] to look," to which Kopp said, "Yes"; and she checked her bag and found the firearm still in it. R. 40, PageID 1104. Kelly's body-camera footage tells a materially different story, however. The camera began recording halfway through a statement by Kopp: "—so, I need to ask you if this is true," to which Lawson replies, "I'm trying to think. I had one with me this weekend." Kopp–Board Br. 10; R. 37, Ex. 40, PageID 681 (body-camera footage); *accord* R. 36, PageID 459 (Kopp's witness statement). The footage then shows Lawson looking through her purse without being directed to do so and stating, "It is in there in the bottom." R. 37, Ex. 40, PageID 681.

Following this interaction, Kopp handed Lawson a letter stating that she was suspended with pay pending an investigation. Kelly and Abrams photographed the firearm in the bag and took custody of the bag and its contents. The meeting lasted approximately four minutes. Abrams then transported Lawson to the sheriff's office. Authorities charged Lawson with unlawful possession of a weapon on school property. A Kentucky prosecutor eventually offered to discontinue the prosecution if Lawson resigned, and she accepted.

## II.  Procedural History

On May 1, 2022, Lawson filed a single-count complaint under 42 U.S.C. § 1983 alleging violations of her Fourth Amendment rights.  She asserts that Defendants-Appellees conducted two warrantless searches of her bag:  First, when Creely and Franke entered her office in her absence and searched her bag; and second, when Kopp allegedly directed her to look through her bag in the presence of Kelly and Abrams.  Lawson also claims that Kopp and the officers unlawfully detained her during that May 5 interaction.  Finally, she seeks to hold the Board responsible pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), based on Kopp's policymaking role, the Board policies that allegedly authorized Creely and Franke to search Lawson's bag, and Creely's and Franke's lack of training.

Lawson sued the individual defendants in their official and personal capacities.  The parties agreed to dismiss the official-capacity portion of this claim as to Creely and Franke, and the district court approved the dismissal.  After discovery, the parties filed cross-motions for summary judgment.  The district court granted judgment in favor of Defendants-Appellees, and this appeal followed.

## III.  Analysis

We review a grant of summary judgment de novo.  *Levine v. DeJoy*, 64 F.4th 789, 796 (6th Cir. 2023).  "Summary judgment is appropriate where the evidence presents no genuine dispute of material fact such that the moving party is entitled to a judgment as a matter of law." *Gammons v. Adroit Med. Sys.*, 91 F.4th 820, 825 (6th Cir. 2024) (citing Fed. R. Civ. P. 56(a)). In evaluating a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party and "must draw all reasonable inferences in [its] favor."  *Id.* at 825, 829. "[W]e may affirm on any grounds supported by the record, even if they are different from the grounds the district court relied upon in reaching its summary judgment decision below."  *Id.* (citing *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994)).

## A. Creely and Franke Lacked State Authority for the Search of Lawson's Bag

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. A plaintiff invoking § 1983 must establish that the defendant was acting "under the color of state law" and deprived the plaintiff of "rights secured by federal law." *League of Women Voters v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (internal citations omitted). An individual acts under color of state law, as required by § 1983, when he has "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Dean v. Byerley*, 354 F.3d 540, 552 (6th Cir. 2004) (cleaned up) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). Framed another way, "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action." *Id.* at 552 (alteration in original) (quoting *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)).

The district court determined that Creely's and Franke's conduct was "fairly attributable to the State" because their status as school employees granted them access to Lawson's office and bag, regardless of whether Lawson locked her office door or whether her purse was visible to passersby; put differently, the court "doubt[ed] whether Creely and Franke could have acted as they did 'without the authority of [their] office.'" *Lawson v. Creely*, 737 F. Supp. 3d 483, 495–96 (E.D. Ky. 2024) (second alteration in original) (first quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); and then quoting *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001)). The district court ultimately entered summary judgment in their favor, however, on the basis that they were entitled to qualified immunity. *Id.* at 502–03. We affirm the district court on different grounds: Creely and Franke lacked state authority for their conduct and did not act under color of state law, as required for a claim under § 1983.

The Supreme Court recently addressed state action by public employees in a case arising from this circuit, *Lindke v. Freed*, 601 U.S. 187 (2024). There, a municipal official maintained a Facebook page on which he posted both personal updates and information relating to his government job. *Id.* at 191–93. After a constituent posted negative comments, the official deleted the negative comments and blocked the constituent from commenting on the official's Facebook page. *Id.* at 190–91, 193. The constituent sued, alleging a violation of his First

Amendment rights. *Id.* at 193. *Lindke* provides some guidance here. First, a claimant under § 1983 cannot "hang his hat on [the defendant's] status as a state employee. The distinction between private conduct and state action turns on substance, not labels: Private parties can act with the authority of the State, and state officials have private lives and their own constitutional rights." *Id.* at 197. Second, there is a "bedrock requirement that 'the conduct allegedly causing the deprivation of a federal right be *fairly attributable to the State*,'" which is only the case if the act "is traceable to the State's power or authority." *Id.* at 198 (quoting *Lugar*, 457 U.S. at 937) (gathering cases). "By contrast, when the challenged conduct 'entail[s] functions and obligations in no way dependent on state authority,' state action does not exist." *Id.* at 198–99 (quoting *Polk County v. Dodson*, 454 U.S. 312, 318–19 (1981)). As the *Lindke* Court summarized, "the '[m]isuse of power, possessed by virtue of state law,' constitutes state action"; but "[t]o misuse power, . . . one must possess it in the first place." *Id.* at 199–200 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

We applied *Lindke* in *Mackey v. Rising* and explained that the first element of the *Dean* test—whether an "individual is possessed of state authority," *Dean*, 354 F.3d at 552 (quoting *Griffin*, 378 U.S. at 135)—"requires courts to identify the 'nature of the act' that the plaintiff challenges, and to compare that act with the state-assigned 'responsibilities' of the official who committed it," 106 F.4th 552, 559 (6th Cir. 2024) (first quoting *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975); and then quoting *Lindke*, 601 U.S. at 199). The *Mackey* panel surveyed how courts might assess different situations under this inquiry:

> This test produces some easy answers. Most obviously, a state employee's conduct will meet the test if a state regulation tasked the employee with engaging in the specific conduct at issue. Consider our oft-cited decision in *Stengel*. There, a police officer shot three bar patrons while attempting to end a middle-of-the-night bar fight. Although the officer was off-duty and out of uniform, "police department regulations" vested him with the authority—indeed, the duty—to stop crime "24 hours a day." And state officials later approved the officer's force as consistent with these regulations.

> But things are not always so simple. In some situations, an official might possess the required state authority even if the State did *not* permit the conduct. . . .

> . . . A state official's conduct can qualify as state action even if the "particular action which he took" (say, a police officer's use of excessive force) "was not authorized by state law" (say, because it violated a State's use-of-force

regulations). . . . [A]s *Lindke* put it, state officials can satisfy the Court's "actual authority" test even if they go beyond (or "[*m*]*isuse*") the power that the State has entrusted them.  Even before *Lindke*, our cases made the same point when they noted that officers can engage in state action if their conduct arose from an "*apparent* duty" of their office or "*ostensible* state authority[.]"  We interpret these statements—consistent with *Lindke*—to cover fact patterns when an official exercises state authority but exceeds the scope of the delegation.

So what distinguishes the *misuse* of authority from the *absence* of authority?  The Supreme Court has offered little guidance on this subject.  But it has clarified that we must look beyond whether the State has permitted the "*particular* action" that a plaintiff challenges.  We must instead ask whether the State has delegated the *general* "type of authority" that an official exercised.

*Id.* at 559–60 (second and third alterations in original) (internal citations omitted).[3]

Lawson focuses on a statement in the employee handbook, asserting that it granted Creely and Franke the authority required to attribute their actions to the state:  "All employees are expected to use sound judgment in the performance of their duties and take reasonable and commonly accepted measures to protect the health, safety, and well-being of others, as well as District property."  R. 36-17, PageID 582 (employee handbook); R. 36-14, PageID 576 (classified-personnel duties); R. 36-15, PageID 577 (certified-personnel duties).

Considering the first *Mackey* situation—a state regulation tasking an employee with engaging in the specific conduct at issue—the identified school policy falls short of tasking Creely and Franke with searching Lawson's purse.  And the rule in *Stengel* that informed the first *Mackey* situation specifically required an officer "to take action 'in any type of police or criminal activity 24 hours a day.'"  *Stengel*, 522 F.2d at 441.  Here, the cited policy is not nearly as specific:  It does not suggest that employees like Creely and Franke must *proactively investigate* potential threats to the health, safety, and well-being of students and others.  In fact, in the employee handbook, the cited policy is immediately followed by a requirement that

---

[3]The district court acknowledged the Supreme Court's holding in *Lindke* and its vacatur of this court's lower opinion, but it concluded that *Lindke* was specific to a public employee's use of social media, and therefore "[t]he general framework for determining where state action exists in other contexts not related to social media appears to remain unchanged."  *Lawson*, 737 F. Supp. 3d at 494 n.1.  Although this court, in *Mackey*, declined to "decide on the precise formulation that governs" outside the social-media context, it nonetheless made clear that regardless of the type of case, courts must determine whether "a state statute, ordinance, regulation, custom, or usage g[a]ve the defendant the 'actual' or 'state' 'authority' to engage in the relevant conduct[.]"  106 F.4th at 559 (quoting *Lindke*, 601 U.S. at 191).

employees like Creely and Franke cooperate with "investigations *conducted by the District*," R. 36-17, PageID 582 (emphasis added), belying the notion that Creely and Franke were tasked with conducting their own. Further, even if Creely and Franke could initiate their own investigation, the cited policy is tempered by language requiring employees to use "sound judgment" and employ methods that are "reasonable and commonly accepted." *Id.* Lawson has not explained how surreptitiously rifling through a coworker's bag is a reasonable and commonly accepted measure.

*Lindke* cautioned courts to give "careful attention to the relevant . . . ordinance [or] regulation" and not to "rely on 'excessively broad job descriptions'" in determining the scope of an official's authority. 601 U.S. at 200–01 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022)). Construing Creely's and Franke's conduct as falling within a policy to "take reasonable and commonly accepted measures to protect the health, safety, and well-being of others" would constitute the excessively broad construction of their job description foreclosed by *Lindke*. Accordingly, the first *Mackey* situation does not support state authority here.

The second *Mackey* situation—whether "an official . . . possess[es] the required state authority even if the State did not permit the conduct"—presents a closer call but ultimately favors a finding of no state authority. *See* 106 F.4th at 560. In this situation, the fact that Creely's and Franke's conduct "exceed[ed] the scope" of the school policy does not preclude that conduct from being state action if "the State has delegated the *general* 'type of authority' that [Creely and Franke] exercised." *Id.* (quoting *Lindke*, 601 U.S. at 200). But nothing in the policy suggests that the state had delegated to Creely and Franke the general authority to conduct investigations or seek out potential dangers beyond what was immediately ascertainable to them. Instead, a holistic review of the school's policies suggests that employees should report concerns and suspicions to supervisors or law enforcement, who are better equipped to develop a plan of action. Further, the fact that these policies contemplate the reporting of *beliefs* and *suspicions* suggests that employees need not conclusively verify their suspicions (such as by searching through a coworker's bag) before reporting them. *See, e.g.*, R. 36-7, PageID 560 (drugs-and-alcohol policy requiring employees to report to law enforcement the suspected possession or sale of controlled substances on school grounds); R. 36-8, PageID 563 (same); R. 36-10, PageID 566

(health-and-safety policy requiring that "[e]mployees shall report any conditions they believe to be unsafe to their immediate supervisor, who shall examine the situation and take appropriate action"); R. 36-17, PageID 585–86 (employee handbook's "Required Reports" section does not require employees to investigate "suspicions" or "belie[fs]," other than arguably for a bomb threat, in which case the employee must "scan the area noting any items that appear to be out of place"). In fact, when the school's weapons policy discusses potential searches, it expressly limits that authority to the school's principal: "In the enforcement of this policy, *principals* may authorize, if they have reasonable suspicion, searches in compliance with applicable Board policies." R. 36-12, PageID 572 (emphasis added). Considering these policies as a whole, the state had not delegated even the *general* type of authority at issue here to employees like Creely and Franke.[4]

For the foregoing reasons, Creely and Franke did not search Lawson's bag pursuant to any state authority, and consequently, Lawson cannot satisfy the acting-under-color-of-state-law element for her § 1983 claim. *Waters*, 242 F.3d at 359.[5]

---

[4]We note as well that Creely and Franke did not understand themselves to be operating under any policy when they searched Lawson's bag. Creely, when asked whether she knew if "there was any state statute or board policy that allowed you to look in to [*sic*] Ms. Lawson's purse in May of 2021[,]" responded, "I do not [know]." R. 38, PageID 779–80; *see also id.* at 733 (similar question and answer). Franke appears to have answered similarly. *See* R. 39, PageID 891. Creely knew of the existence of the weapons policy but was "not completely familiar" with its contents. R. 38, PageID 771. Franke understood the drugs-and-alcohol policy to apply only to "students," and she "had not seen" any written weapons policy. R. 39, PageID 845–46.

[5]The district court used a formulation of the state-action test permitting a finding of state action if the defendant's "conduct is such that the actor could not have behaved as he did without the authority of his office." *Lawson*, 737 F. Supp. 3d at 494 (quoting *Waters*, 242 F.3d at 359). The district court then reasoned that but for Creely's and Franke's status as school (and state) employees, they would not have been in a position to search Lawson's bag. *Id.* at 496 ("Creely's and Franke's status as school employees is the very thing that enabled them access to Ms. Lawson's office and bag. . . . Their very presence in the Guidance Suite . . . appears to be connected to their employment."); *see also id.* ("Creely and Franke were on duty during the school day when they entered Ms. Lawson's office, and they used their access as school employees to do so."). As employed here, this but-for approach lacks sufficient connection to "the *authority* of [Creely's and Franke's] office," *Waters*, 242 F.3d at 359 (emphasis added), and therefore runs afoul of *Lindke*'s admonition that a plaintiff cannot merely "hang his hat on [the defendant's] status as a state employee," 601 U.S. at 197; *see also Stengel*, 522 F.2d at 441 ("It is the nature of the act performed, not . . . the status of being on duty, or off duty, which determines whether the officer has acted under color of law." (quoting *Johnson v. Hackett*, 284 F. Supp. 933, 937 (E.D. Pa. 1968))).

**B. Kopp Did Not Violate Lawson's Constitutional Rights**

Lawson argues that Kopp unlawfully seized her on May 5, 2021, when he met her in the school lobby and led her to Kelly's office. She also claims that Kopp unlawfully searched her bag in Kelly's office. The district court concluded that Kopp seized Lawson for Fourth Amendment purposes but properly conducted an investigative stop under the framework of *Terry v. Ohio*, 392 U.S. 1 (1968), resulting in no constitutional violation. *Lawson*, 737 F. Supp. 3d at 505–06. Additionally, the district court found that Lawson consented to the search of her bag because she initiated the search and conducted it herself. *Id.* at 507. We affirm as to both conclusions.

As a preliminary matter, Kopp and the Board argue that Lawson improperly attempts to import Fifth Amendment case law into her Fourth Amendment claim. Lawson indeed does not expressly mention the Fifth Amendment once in her complaint—though in her facts section, she briefly alleges that when she was "in custody" in Kelly's office, she received no "rights advisement," R. 1, PageID 5—and her only count is titled "Fourth Amendment Violations by Creely, Franke, and Kopp (and *Monell* Liability for same [*sic*] by the Defendant Board)," *id.* at 6. Significant portions of Lawson's opening brief and reply make the case that Lawson was subject to a custodial interrogation and should have been read her *Miranda* rights, but this cannot overcome her failure to plead a § 1983 claim for the deprivation of her Fifth Amendment rights.[6]

Lawson instead appears to argue that if someone is "in custody" for purposes of the Fifth Amendment, it cannot also be the case that the Fourth Amendment analysis should proceed under *Terry*. Lawson Br. 27 ("Because [Lawson] was in custody during her interrogation, *Terry* simply does not apply."). This court has explained that the Fourth Amendment seizure and Fifth Amendment custody analyses are different. *United States v. Salvo*, 133 F.3d 943, 949 (6th Cir.

---

[6]Even if we interpreted Lawson's fleeting reference to a "rights advisement" as alleging a Fifth Amendment claim, it would not survive summary judgment. The Supreme Court has explained that "violations of judicially crafted prophylactic rules [such as those found in *Miranda*] do not violate the constitutional rights of any person" and therefore "cannot be grounds for a § 1983 action." *Chavez v. Martinez*, 538 U.S. 760, 772 (2003) (plurality opinion) (gathering cases); *accord McKinley v. City of Mansfield*, 404 F.3d 418, 432 n.13 (6th Cir. 2005). And "a violation of the Self-Incrimination Clause" itself does not occur until a defendant's compelled statements are "use[d] in a criminal case." *Chavez*, 538 U.S. at 767. Lawson does not allege that any statements she made during the May 5, 2021, questioning were later used against her in criminal proceedings.

1998) ("[A]lthough stopping an automobile is a 'seizure' under the Fourth Amendment, the occupants are not necessarily 'in custody' for the purposes of the Fifth Amendment." (citing *Berkemer v. McCarty*, 468 U.S. 420, 427 (1984))); *United States v. Woods*, 711 F.3d 737, 740 (6th Cir. 2013) (where the defendant argued that authorities obtained his statement and related physical evidence in violation of *Miranda*, the district court's conclusion that such evidence was lawful under *Terry* and the plain-view doctrine "conflate[d] the applicable Fifth Amendment analysis with inapposite Fourth Amendment doctrine"). In any event, because Lawson has brought only a Fourth Amendment claim, and because consideration of Fifth Amendment case law is unhelpful, we focus our analysis on the Fourth Amendment.[7]

### 1. Kopp Did Not Unlawfully Seize Lawson under the Fourth Amendment

A Fourth Amendment seizure occurs "when, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also Florida v. Bostick*, 501 U.S. 429, 434, 437 (1991) (reframing the inquiry as whether "a reasonable person would feel free 'to disregard the police and go about his business'" or "ignore the police presence" (first quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991); and then quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988))). A reasonable person would not believe herself free to leave if she were approached by authorities (who identified themselves as such) and, rather than being briefly questioned, were asked to follow them to an office. *Knox*, 839 F.2d at 288–89 (citing *United States v. Jefferson*, 650 F.2d 854, 856 (6th Cir. 1981)). *But cf. United States v. Collis*, 766 F.2d 219, 221 (6th Cir. 1985) (no seizure where the defendant agreed to accompany an agent to baggage claim, and there was no indication of "coercive or intimidating behavior" that would suggest that compliance was compelled).

Kopp did not seize Lawson when he met her in the school lobby: Although he led her to an office for further questioning, he did not suggest that her compliance was compelled; instead, he asked if "she could answer a few questions," and she agreed. R. 36, PageID 459. Lawson

---

[7]For the same reasons, Lawson's attempt to fault the district court for applying investigative-stop case law, rather than less-applicable Fifth Amendment case law, is unconvincing.

was seized, however, when she found herself in Kelly's office with the door closed, Kopp blocking that door, and two law-enforcement officers equipped with firearms. *See id.* at 460; R. 40, PageID 1020 (Lawson's testimony that given Kopp's position, she felt that "[t]here was no way that [she] could go out"); *Mendenhall*, 446 U.S. at 554 ("circumstances that might indicate a seizure . . . would be the threatening presence of several officers [or] the display of a weapon by an officer," *inter alia*). And although Kopp and the Board argue that Lawson was questioned at work in an office similar to her own—*i.e.*, a location not "inherently intimidating," like a station-house, *Salvo*, 133 F.3d at 951 (discussing this factor in a custodial-interrogation context)—this argument is undercut by the facts. Lawson was not questioned in a random coworker's office but rather in the office of the law-enforcement officer assigned to the school. And Kelly's body-camera footage reveals that the room was relatively small and, with the blinds drawn and paper covering the window on the door, was concealed from anyone outside. *Cf. id.* (the defendant was not "in a confined space in which he might have felt constrained or intimidated," because the room "was large with windows facing various public areas"). In these circumstances, a reasonable person would not have felt free to disregard the police and go about her business.

Once seized in Kelly's office, Lawson was entitled to the protections afforded to an investigative stop. Such a stop is proper where there is a "reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (alteration in original) (quoting *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007)). The stop also must be "sufficiently limited in time," and the investigative means must be "the least intrusive means reasonably available." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 825–26 (6th Cir. 2005)). An unreasonable duration or unreasonable means may convert an investigatory stop into an arrest requiring the more onerous showing of probable cause. *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997) (citing *United States v. Place*, 462 U.S. 696, 709 (1983); *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985)).

Kopp had a reasonable, articulable suspicion that Lawson possessed a firearm on school grounds based on the reports he received from Reid's supervisor and Abrams. Establishing a

reasonable, articulable suspicion is difficult in cases of anonymous informants providing vague descriptions of individuals or their alleged criminal acts.  But these reports were from Kopp's coworkers, based on personal observations of Lawson's allegedly illegal conduct.  *Cf., e.g.*, *United States v. Johnson*, 620 F.3d 685, 693 (6th Cir. 2010) (discussing factors such as the reliability of the tip, whether the informant identified the suspects with particularity, and whether the information alleged criminal activity).  Kopp was therefore justified in making an investigative stop based on the reports.

The investigative stop was also sufficiently limited in time, and Kopp employed the least intrusive means reasonably available.  The meeting lasted approximately four minutes, and as the body-camera footage indicates, Kopp resolved the question whether Lawson had a firearm in her bag within the first minute of the meeting; he and the officers then spent the remaining time explaining to Lawson what would happen next and photographing the bag.[8]  It would be difficult to imagine a more expeditious investigation.  The means were similarly appropriate:  Kopp made the reasonable judgment not to immediately accuse Lawson in the school lobby, and instead he led her to a secure office and promptly informed her of the allegation.  *Salvo*, 133 F.3d at 951 (noting that law enforcement chose a private interview location "to save [the defendant] from a more public exposure of his criminal activity, not out of a desire to coerce or intimidate him").  In sum, Kopp "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly." *Sharpe*, 470 U.S. at 686.

Lawson argues that the secluded nature of Kelly's office and the presence of Kelly and Abrams escalated the investigatory detention to the level of an arrest requiring probable cause.  "To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as 'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force.'" *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)).  The facts of *Lopez-Arias* make clear that the

---

[8]To the extent that Lawson takes issue with the nature of her seizure *after* she searched her bag, law enforcement had probable cause for an arrest once she acknowledged that the firearm was in her bag.

present case did not escalate into an arrest during the four-minute interaction. In *Lopez-Arias*, the defendants were effectively arrested when they "were (1) stopped by four DEA agents brandishing firearms, (2) handcuffed, (3) placed into the backseats of separate DEA vehicles, (4) transported from the scene of the stop, (5) read their *Miranda* rights, and (6) questioned." *Id.* at 628.

Here, Lawson voluntarily followed Kopp to Kelly's office, Kelly and Abrams did not brandish their weapons, and Lawson was not subjected to physical restraints such as handcuffs. The *Lopez-Arias* court also noted that employing some of the above measures would not escalate an investigative detention into an arrest if they were proportional to safety concerns. *Id.* (citing *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814–15 (6th Cir. 1999)). Here, even if Kopp's decision to bring Lawson to a private, secure office could be faulted as possibly escalating the interaction into an arrest, it was justified by the potential dangers of confronting a likely armed person in the school lobby. This undermines Lawson's reliance on *Florida v. Royer*, where the Supreme Court found that the limits of *Terry* had been exceeded when authorities moved the defendant from an airport concourse to a police interrogation room because "[t]he record d[id] not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing [the defendant] to the police room." 460 U.S. 491, 505 (1983).

For these reasons, the district court correctly concluded that Kopp did not seize Lawson in a manner that violated the Fourth Amendment.

### 2. Lawson's Search of Her Own Bag Did Not Violate the Fourth Amendment

A person may waive her Fourth Amendment rights by consenting to a search, which can be shown "in the form of words, gesture, or conduct." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)). Consent must be "freely and voluntarily given" and is not established by "showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968). To determine whether there was consent, courts examine the totality of the circumstances, including the individual's "age, his or her education and intelligence, the

existence of advice concerning the nature of the constitutional right that is implicated, the length of detention prior to the request for consent, the nature of any prior questioning, and whether any physical punishment was involved." *Morphis v. United States*, 110 F. App'x 527, 530 (6th Cir. 2004) (first citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); and then citing *United States v. Guimond*, 116 F.3d 166, 170 (6th Cir. 1997)). "The absence of an overt act or threat of force, promises made to a defendant, or indications of more subtle forms of coercion that might flaw a defendant's judgment indicate that a defendant's consent was freely given." *Id.* (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)).

Lawson contends that Kopp, flanked by two law-enforcement officers, directed Lawson to search her bag. But Kelly's body-camera footage tells a different story and shows that no search by state actors occurred at all: Kopp informed Lawson of the allegation and stated that he "need[ed] to ask [her] if this [wa]s true." R. 37, Ex. 40, PageID 681. Then Lawson, while answering verbally, initiated a search of her bag on her own. "Where video evidence depicts the events, we view the facts 'in the light depicted by the videotape' and do not adopt a version of the facts that is 'blatantly contradicted by the record.'" *Jackson-Gibson v. Beasley*, 118 F.4th 848, 853–54 (6th Cir. 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). More than consenting to a search by authorities, then, Lawson *herself* revealed the presence of the firearm in her bag without being directed to do so. *United States v. Strouth*, 311 F. Supp. 1088, 1093 (E.D. Tenn. 1970) ("[M]ere acceptance by officers of that which a defendant turns over to them voluntarily is not 'a search' within the purview of the Fourth Amendment.").[9] Accordingly, no constitutionally impermissible search of Lawson's bag occurred on May 5.

## C. The Board Is Not Liable Under *Monell*

To establish the Board's municipal liability under *Monell*, Lawson must show both "the deprivation of a constitutional right" and that the Board "is responsible for that violation." *Doe*

---

[9]Even if we determined that a search occurred, the *Morphis* factors would suggest that Lawson consented to it. Although Kelly and Abrams were present, they did not threaten Lawson or claim to have a right to search her bag; in fact, they did not speak until *after* she had searched her bag. Further, Lawson is an educated adult; she had been in Kelly's office for only moments before she looked through her bag; there was no significant prior questioning or physical punishment; and there were no threats, promises, or other coercive measures applied to Lawson.

*v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 505–06 (6th Cir. 1996) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)).  Because Creely and Franke lacked state authority for their conduct, and because Kopp did not violate Lawson's Fourth Amendment rights, Lawson cannot maintain a *Monell* claim against the Board.  *Pollard v. City of Columbus*, 780 F.3d 395, 404 (6th Cir. 2015) ("Because the officers did not commit a violation of [the decedent's] constitutional rights, [the plaintiff's] claim of municipal liability must fail . . . .").  We therefore affirm the district court's entry of summary judgment in favor of the Board.

## IV.  Conclusion

For the reasons set out above, we **AFFIRM**.